Argued and submitted May 7, reversed and remanded for new trial August 1, 1990

# STATE OF OREGON,
*Respondent,*

*v.*

# JUNE FREUND,
*Appellant.*

(87-1282; CA A60284)

796 P2d 656

Wayne Mackeson, Portland, argued the cause for appellant. With him on the brief was Des Connall, P.C., Portland.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

WARREN, J.

Buttler, P. J., specially concurring.

**WARREN, J.**

Defendant appeals her conviction for manufacturing, possessing and delivering marijuana. ORS 475.992. She assigns error to the trial court's denial of her motion to suppress the marijuana and paraphernalia seized from her property and from inside her house. We reverse.

On September 3, 1987, an anonymous caller informed Sergeant Hepp that defendant and Nemarnik were growing marijuana at a house on Gibson Road. Hepp learned Nemarnik's license plate number from his probation officer. The next day, Hepp and Officer Landon went looking for the house, which the caller had described in general terms. Eventually, they drove their unmarked vehicle down defendant's 40 foot driveway and recognized Nemarnik's vehicle license number. Defendant approached their vehicle, and Hepp asked about a fictitious person and then left. Defendant's neighbors confirmed that she lived next door. The officers peered over the neighbors' fence at defendant's property, but did not see any marijuana.

When support arrived, five plainclothes, armed officers in three unmarked vehicles drove down defendant's driveway. Defendant, Nemarnik and another man were outside. Hepp got out of his vehicle and met defendant halfway to the house. Hepp identified himself as "Sergeant Hepp of the Washington County Sheriff's Department" and showed her his badge. He testified that this then occurred:

> "I told her that I was there to pick up the marijuana plants that she was growing. She seemed shocked. She didn't say anything. She just stood there and looked at me. I again told her that I was there to pick up the marijuana plants that she had growing and that I wanted to do it as calmly [and] efficiently as possible."

She pointed to an area behind the house as she replied that she had some marijuana plants growing there for her personal use. Hepp advised her of the *Miranda* rights, and she said that she understood. Hepp asked her "if she would take us to them to show us where they were and she agreed and she walked up behind the house."

Defendant showed Hepp nine marijuana plants in the yard. Hepp told her that they would seize the marijuana and

"if she had any illegal contraband in the house that we would want to seize that as well." Hepp read her a consent form that informed her that she had the right to refuse consent, and she signed the form. Once inside, Hepp smelled "growing marijuana," and the officers found some shredded marijuana, a scale and a bong. Hepp noticed a deadlocked door that appeared to lead to the garage, and he asked her if they could go in. Defendant said, "[N]o * * *. I don't want you to search anymore."

Hepp told defendant that if she did not consent, he would apply for a warrant and felt confident that he could get one. He said that that would take several hours and that one of the officers would have to remain at the house. Hepp told her that if marijuana were found in the garage, she would not face additional charges, because they had already found enough marijuana to charge her. He informed her that he could arrest her and take her to jail and that she would not be arraigned until Tuesday. If she cooperated, however, he would merely issue a citation. He asked her to read the consent form again, and, after conferring with Nemarnik, she consented. In the garage, they found marijuana plants, "grow lights" and a 300 gallon water tank.

Defendant argues that: (1) the officer's first drive down the driveway was an unlawful search; (2) the officer's second drive down the driveway was an unlawful search; (3) the second encounter with defendant was an unlawful stop; (4) the officer's initial statement was custodial interrogation not preceded by warnings; (5) the later questioning was improper, because she did not waive her right against self-incrimination; (6) the officers unlawfully secured the premises; (7) defendant did not consent to a search of her yard; and (8), if she did consent, her consent was involuntary.

■ ■ We need not resolve arguments one through six, because we think that the case stands or falls on the issue of defendant's consent to the search of her yard. On that issue, the trial court found:

"While I'm still thinking about the 'we're here to pick up the marijuana,' I'm not terribly impressed with the show of force argument as a coercive factor. I think there is good reason for that and it was expressed by several of the deputies

as safety. Also through the years I have noticed that physically large and imposing police officers have much less trouble with the public than physically small police officers. There just doesn't seem to be the kind [sic] of trouble. People don't challenge them and there aren't the ugly kind[s] of confrontations and physical battles that there might be. Until you get liquor involved and then it doesn't seem to matter.[1]

"There were three police cars, five policemen and three of the people that they were dealing with. There was probably some show of force, but it seems to me, that the safety considerations are important. There may be a bit of coercive atmosphere there and that's part of the totality of the circumstances.

"All three cars were unmarked so we don't have the kind of show of force with police cars decorated out with stars on them and stripes of colors and banks of lights situation. They were three unmarked cars. Five or six people. Going up there at a normal speed, not sliding to a halt with the doors opened and people pouring out with guns drawn. Seemed to be pretty casual situation and not even the kind of coercive uniform situation. Some of them even described exactly what they were wearing, casually dressed.

"* * * * *

"It seems to me, that while that is * * * getting on toward an unlawful coercive situation that that was not so coercive as to make her pointing and comment that the marijuana is for my personal use unlawful. She was given the Miranda rights and she did understand. As a matter of fact, at some later point as was pointed out, she stopped the situation and was not afraid to do so. I understand she could and she did. So it seems to me when they went up to look at the plants that they had given her [sic] consent to do so. Consent can be given in a number of different ways."

We are not bound by the trial court's conclusions, if the historical facts do not meet the constitutional standards for a valid consent to search. *State v. Warner,* 284 Or 147, 585 P2d 681 (1978).

■      When the state relies on consent to justify a warrantless search, it has the burden of proving by clear and

---

[1] We cannot tell from the trial court's comments whether it found that the officers were "physically large and imposing." When physical appearance is a relevant factor, trial courts should make express findings on the record.

convincing evidence that, under the totality of circumstances, the consent was the product of the defendant's free will and was not the result of coercion, express or implied. *Schneckloth v. Bustamonte*, 412 US 218, 226-27, 93 S Ct 2041, 36 L Ed 2d 854 (1973); *State v. Gaither*, 76 Or App 201, 708 P2d 646 (1985). "Mere acquiescence to lawful authority is not consent." *State v. Little*, 249 Or 297, 302, 431 P2d 810 (1968). *See also Bumper v. North Carolina*, 391 US 543, 88 S Ct 1788, 20 L Ed 2d 797 (1968).

■ When the officers came to defendant's house, they knew that they could not get a warrant to search, because they did not have probable cause. Their intent was to get defendant's consent. Yet, Hepp's initial statement cannot be characterized as a request for consent. The officer stated that "he was there" to pick up the marijuana and "he wanted" to do it calmly. The words used in the first phrase are unconditional; they do not invite a response other than acquiescence. In contrast, the words in the second phrase are supplicatory and do invite a response. Read together, the officer's statement told defendant that she had no choice whether a search would occur; her only option was whether the search and seizure was to be "calm and efficient." Defendant merely chose the option favoring calmness and efficiency when she pointed to where marijuana could be found.

■ ■ At that point, Hepp advised defendant of her *Miranda* rights. He then asked her if she would show him where the plants were, and she did. The trial court reasoned that the *Miranda* warnings made it more likely that the consent was voluntary. Although *Miranda* warnings are a factor, they were not likely to refute the impression that Hepp had already made, because he did not inform her then that she had the right to refuse to consent. Furthermore, defendant's acquiescence in Hepp's request that she show them where the plants were did not constitute a voluntary consent, given the events that preceded it. Hepp did not ask, "May we search?" but "Will you show us?" Again, defendant was likely to conclude that the choice merely was between cooperating or not cooperating with a search that was bound to occur.[2] *Compare*

---

[2] The trial court reasoned that the officers' show of force was justified by concern for their safety. Safety of the officers is not a relevant consideration in determining whether a suspect's will was overborne.

The trial court also reasoned that defendant knew that she could refuse, because she later told the officers to stop searching. That is not persuasive. By that time, Hepp had informed defendant that she had the right to refuse consent.

*State v. Campbell,* 43 Or App 979, 607 P2d 745 (1979).

The state argues that the evidence found in the house and garage was properly admitted, despite any prior illegality, because defendant consented to the search after being informed that she had the right to refuse to consent. In *State v. Williamson,* 307 Or 621, 626, 772 P2d 404 (1989), the Supreme Court examined the effect of a consent to search following illegal police conduct:

> "We do not hold that consent can never legitimize a search when the occasion to give or refuse consent followed some unauthorized act of the police. We hold only that a search is not legitimized by consent obtained under the pressure of police action that became available to police only by the prior unauthorized conduct."

■ Defendant's consent to the searches of her house and garage was obtained under the pressure of the officers' prior illegal search. After the search of her yard, it would have appeared to defendant that she had little to lose by consenting to a search of her house, where she had a relatively small amount of marijuana. She consented to the search of her garage only after being told that she would not face additional charges, because the police already had found enough marijuana, and that, if she did not consent, the officers would get a warrant. The officers "were trading on evidence that they had only by virtue of the unlawful" search. 307 Or. at 626.

Reversed and remanded for a new trial.

**BUTTLER, P. J.,** specially concurring.

When the five armed officers in plain clothes pulled into defendant's driveway in three unmarked cars, followed by Sergeant Hepp's confronting defendant, showing his badge and stating that he was there to pick up the marijuana plants that she was growing, the confrontation was a stop within the meaning of ORS 131.615(1). Because, as the state concedes, the officers did not have a reasonable suspicion that defendant had committed a crime, the stop was unlawful.

There was a clear show of police authority that would make the person encountered feel that she was not free to refuse to cooperate or that she was free to leave the scene. *State v. Spenst,* 62 Or App 755, 662 P2d 5, *rev den* 295 Or 447 (1983). Because everything that followed Hepp's assertion of

authority was derivative of that illegality, the evidence must be suppressed. *State v. Williamson,* 307 Or 621, 772 P2d 404 (1989).

    With that clarification, I agree with the majority.