Argued and submitted October 31, 2006, affirmed March 14, 2007

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RON RY,
*Defendant-Appellant.*

Douglas County Circuit Court
04CR1206FB; A126045
(Control)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STANLEY RONALD GUINTO,
*Defendant-Appellant.*

Douglas County Circuit Court
04CR1206FA; A126633

154 P3d 724

Peter Gartlan, Chief Defender, Legal Services Division, argued the cause for appellants. With him on the brief was Peter A. Ozanne, Executive Director, Office of Public Defense Services.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Defendants, a driver (Guinto) and his passenger (Ry), appeal their convictions for delivery of a controlled substance, *former* ORS 475.992 (2003), *renumbered as* ORS 475.840 (2005), challenging the trial court's denial of their motions to suppress evidence discovered during a search following a traffic stop. Or Const, Art I, § 9; US Const, Amend IV. They contend that the search was unlawful because the predicate consent to search was not voluntary. For the reasons set forth below, we affirm.[1]

In reviewing a denial of a motion to suppress, we are bound by the trial court's findings of historical facts as long as there is constitutionally sufficient evidence in the record to support those findings. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). For purposes of Oregon constitutional analysis, whether consent to a search was voluntary is a conclusion of law rather than a question of fact. *State v. Stevens*, 311 Or 119, 135, 806 P2d 92 (1991). "In analyzing whether consent to a search is voluntary, the relevant inquiry is whether, under the totality of the circumstances, the consent was the product of the defendant's free will or, conversely, was the result of express or implied coercion." *State ex rel Juv. Dept. v. Stephens*, 175 Or App 220, 225, 27 P3d 170 (2001).

We summarize the facts as found by the trial court and as supported by evidence in the record.[2] On the morning of June 29, 2004, Trooper Bennett of the Oregon State Police stopped a car traveling on Interstate 5 near Roseburg for exceeding the speed limit. Defendant Guinto was the driver; defendant Ry was the only passenger. As he approached the car on the passenger side, Bennett noted that Ry's seat belt was not positioned properly. Bennett spoke with Guinto about exceeding the speed limit and with Ry about the seat belt violation. Bennett asked Ry for his identification twice,

---

[1] These cases were consolidated for oral argument and, after argument, the court, on its own motion, consolidated them for decision.

[2] The record contains a videotape of the entire traffic stop that recorded what was said by Trooper Bennett. However, the videotape did not clearly record all statements made by defendants when they were inside the car.

and Ry produced identification after asking why he needed to show it. Bennett inquired about who owned the car, but the name given by defendants did not match the name on the car's registration.

Bennett noted that both defendants appeared nervous and, particularly, that Ry was shaking and his pulse was visible in his neck. Based on defendants' nervousness, their inability to satisfactorily identify the car's owner, and Ry's hesitancy in providing his identification, Bennett became suspicious that defendants were involved in criminal activity and became concerned that they had a weapon in the car. Over the course of approximately one minute, as shown on the videotape of the stop, 211 Or App at 300 n 2, Bennett made the following statements to defendants as he stood beside the passenger door of the car:

> "Do you have any weapons in the vehicle? I'd like to search your vehicle for weapons. Will you give me permission to search your vehicle for weapons? I want to search your vehicle. I know, I'd like to search it though. I'd, you're extremely nervous, his heartbeat's visible in the back of his throat, and you're making me suspicious that you have weapons. That's why I'd like to check your vehicle—search your vehicle for weapons. Do you have a weapon in the vehicle? Okay, I'd like to search it. Okay? So I'd like you to step out if you would please and let me search your vehicle for a weapon. What do you have in the vehicle? Okay, what kind of luggage do you have? Okay, don't be reaching around too much, alright? Okay, so do you have a weapon in the vehicle? You need to tell me if you do. Okay, well, I'd like to search it for a weapon, all right? Well, I'd like to search it for a weapon to make sure you don't have a weapon in the vehicle."

Although the videotape of the incident did not record with clarity defendants' statements to Bennett during that time, Bennett testified at the suppression hearing that Guinto said multiple times in response to Bennett's inquiries about weapons, "I told you there wasn't a gun" or "I told you we don't have any." After making the statements quoted above, Bennett radioed, in code, for a backup officer. At virtually the same time as Bennett was using his radio to call in the backup request, Guinto consented to a search of the car.

Bennett had defendants get out of the car, then frisked them for weapons but found none. After the backup officer arrived, Bennett searched the passenger compartment of the car but found nothing suspicious. He then asked Guinto to open the trunk of the car, which Guinto did. Bennett asked questions of defendants about several articles in the trunk, then removed a bag, asking, "Whose is this? Will you open it for me please? What do you have in there? Can you show me please?" Guinto then opened the bag, and Bennett reached into the bag and examined its contents. Bennett then removed a second bag, again asked to whom it belonged, and, when Ry responded that it was his, Bennett asked Ry to open it for him. Ry did so, and Bennett examined its contents.

Bennett then reached for a third bag and asked to whom it belonged. Ry identified the bag as his. As Bennett picked up the third bag, he felt that it was heavy and smelled strongly of marijuana. Bennett immediately arrested both defendants. Further examination of the third bag revealed approximately five pounds of marijuana. The trunk of the car also contained more than $50,000 in cash.[3]

Before trial, both defendants sought to suppress the evidence found in the trunk of the car, contending, as pertinent here, that the consent to search the car was not given voluntarily. Defendants contend, particularly, that Bennett's repeated "demands" to search the vehicle for weapons notwithstanding defendants' "refusal" were so persistent, aggressive, and ultimately coercive as to render Guinto's consent at most mere "acquiescence" to Bennett's manifest determination to search. Bennett, in defendants' view, simply was not going to take "no" for an answer. Defendants further contend that the opening of the car trunk, with the consequent "plain smell" observation as Bennett lifted the third bag, was the unattenuated product of Guinto's alleged involuntary consent.

---

[3] Later that day, while in custody on the present charges, Ry had a telephone conversation that was tape-recorded by jail personnel. During that conversation, Ry told the woman to whom he was speaking that Guinto had consented to the search of the car because of Ry's outstanding warrants. Given our analysis and disposition, we need not address the significance, if any, of Ry's statements regarding Guinto's reasons for consenting to the search.

The trial court denied the motion. With respect to the interchange between Bennett and defendants that culminated in Guinto's consent, the court found:

"Trooper Bennett asked if there were weapons in the vehicle, and asked for permission to search the vehicle. Mr. Guinto responded that they did not have any weapons. The same general question and answer were repeated several times, and the driver then appeared to comply with the request to search. Mr. Ry began to reach for his right ankle, and was told to not reach around. Trooper Bennett again asked for consent to search for a weapon and Mr. Guinto responded that they did not have one.

"Trooper Bennett radioed in code for a backup officer, and very shortly after, Mr. Guinto spontaneously told Trooper Bennett that he could search the vehicle. Trooper Bennett confirmed this, and then asked them to step out."

The court's conclusion as to consent was unadorned: "Stanley Guinto voluntarily consented to a search of the vehicle." Thereafter, both defendants entered conditional guilty pleas pursuant to ORS 135.335(3), thus reserving their rights to appeal the denial of their suppression motions.

■    On appeal, defendants reiterate their arguments, invoking both Article I, section 9, and the Fourth Amendment. They assert that, because of Bennett's persistence in seeking permission to search the car, by asking to search nine times in a little over one minute, Guinto's consent to the search was not given voluntarily. Defendants further assert that the consent in this case was not the product of free will because Guinto "consented only after the trooper refused to honor" repeated refusals of consent.

The state counters that Guinto's consent to search the car was voluntary. The state contends, principally, that Bennett "requested"—rather than demanded—consent, that his tone remained "conversational" throughout, and that his multiple "requests" were necessitated both by Guinto's non-responsiveness and by defendants' movements that contributed to Bennett's concerns about whether there was a weapon in the car.[4]

---

[4] The state also asserts, apparently as a "right for the wrong reason" alternative basis for affirmance, that, even if Guinto's rights were violated when his initial

As noted above, the standard for analyzing voluntariness of consent under Article I, section 9, is whether, "under the totality of the circumstances, the consent was the product of the defendant's free will or, conversely, was the result of express or implied coercion." *Stephens*, 175 Or App at 225.

As an initial matter, we reject defendants' characterization of the encounter as involving "repeated refusals" of consent to search. When viewed consistently with the standard prescribed in *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968), the record demonstrates that, although Guinto answered Bennett's questions concerning whether a weapon was in the car by repeatedly denying that a weapon was in the car, Guinto never specifically answered Bennett's repeated requests for permission to search the car until after the final request—at which point Guinto consented. Thus, contrary to defendants' premise, we must assume that defendants, and Guinto particularly, never explicitly refused to consent in response to Bennett's requests. Rather, under the controlling standard of review, the record shows only that Bennett repeatedly sought consent to search the car for weapons, despite the driver's, Guinto's, repeated statements that there were no weapons in the car.

Defendants primarily invoke *State v. Freund*, 102 Or App 647, 796 P2d 656 (1990), for the proposition that, in the totality of the circumstances, Bennett's persistent efforts to obtain consent to search were impermissibly coercive. In *Freund*, police officers, who had received an anonymous tip that the defendant was growing marijuana, approached the defendant, who was standing outside of her home. One officer, Hepp, told the defendant that the officers were there " 'to pick up the marijuana plants that she was growing.' " 102 Or App at 649. When the defendant did not respond, Hepp repeated that he was there to pick up the marijuana plants and that he " 'wanted to do it as calmly [and] efficiently as possible.' " *Id.* (brackets in original). The defendant then told the officers where the plants were located, and Hepp asked

---

consent was obtained to search the car, Ry separately consented to a search of his luggage in the trunk, which ultimately resulted in the discovery of the marijuana. Again, given our analysis and disposition, we do not address that contention.

her " 'if she would take us to them to show us where they were and she agreed[.]' " *Id.*

The trial court denied the defendant's motion to suppress, and we reversed. In so holding, we concluded that the consent was not voluntarily given:

> "Hepp's initial statement cannot be characterized as a request for consent. The officer stated that 'he was there' to pick up the marijuana and 'he wanted' to do it calmly. *The words used in the first phrase are unconditional; they do not invite a response other than acquiescence.* In contrast, the words in the second phrase are supplicatory and do invite a response. *Read together, the officer's statement told defendant that she had no choice whether a search would occur; her only option was whether the search and seizure was to be 'calm and efficient.'* "

*Id.* at 652 (emphasis added). We further held that the "defendant's acquiescence in Hepp's request that she show them where the plants were did not constitute a voluntary consent, given the events that preceded it. Hepp did not ask, 'May we search?' but 'Will you show us?' " *Id. See also State v. Will*, 131 Or App 498, 506, 885 P2d 715 (1994) (following *Freund*, holding that the defendant's mother's failure to object to officer's reentry into premises, after the officer "informed her that * * * he would be seizing the narcotic paraphernalia," was mere "acquiescence" that "cannot be held to be voluntary consent").

Defendants contend that the situation here was analogous to that in *Freund*. In a very brief time—roughly a minute—Bennett repeatedly expressed his desire to search the car for weapons and sought to obtain defendants' consent to do so. Seven times Bennett told defendants either that he would "like to" or "want[ed] to" search the car. Once Bennett explicitly asked defendants if they "would give me permission to search your vehicle." Once, in the midst of the exchange, Bennett's phrasing became directive: "I'd like you to step out if you would please and let me search your vehicle for a weapon"—but then he immediately returned (twice) to his "I'd like to search" phrasing.

Defendants suggest that at least one of Bennett's statements—"I'd like you to step out," etc.—was so imperative in context that it did "not invite a response other than acquiescence." *Freund*, 102 Or App at 652. Further, and more broadly, defendants contend that, even if Bennett's words are viewed simply as requests for consent to search, such persistent and insistent repetition of those requests over such a short period of time rendered the consent involuntary because a reasonable person in defendants' position would have understood that he or she "had no choice whether a search would occur," *id.*—the only question was how it would occur.

*Freund* is materially distinguishable. In *Freund* (and *Will*), officers baldly and unconditionally announced their intent to seize items. There was no effort to request, and obtain, consent. Here, by contrast, Bennett did seek consent to search the car. Although most of the requests were not framed as questions, Bennett's phrasing—*e.g.*, "*I'd like* to search it" (emphasis added)—expressed both his desire to receive consent to search the vehicle and his understanding that he would not, and could not, search without consent.

There is, in ordinary social intercourse, a world of difference between saying "I'd like to come in," and "I'm coming in." Ultimately, that is the difference between this case and *Freund*.[5]

To be sure, in one instance during the colloquy, Bennett briefly crossed over the line into the imperative: "So I'd like you to step out if you would please and let me search your vehicle for a weapon." In isolation—and notwithstanding the qualifying "if you would please"—that statement

---

[5] We acknowledge that the dynamics of encounters between law enforcement officers and citizens, particularly in the context of stops and arrests, do not always, or even necessarily, comport with the conventions of "ordinary social intercourse." *Cf. State v. Holmes*, 311 Or 400, 813 P2d 28 (1991) (seizure occurs if an officer engages in conduct significantly beyond that accepted in ordinary social intercourse). We also acknowledge that the particular phrasing of a purported request is not necessarily dispositive: A grade school bully's "request" to a puny classmate that he "would *really* like some of his ice cream" is, contextually, coercive. Still, in the absence of compelling circumstances to the contrary, an officer's particular choice of language is highly significant in assessing whether a reasonable person would understand the officer's remarks to be so coercive as to render refusal to consent futile.

could reasonably be understood as a command. However, in context, it was preceded by a request to search the car and was followed by a question about the luggage in the car and then two final "I'd like to search" requests. Further, and significantly, defendants did not respond to Bennett's statement by getting out of the car—that is, they did not "acquiesce" at that point. Rather, it was only after Bennett radioed to summon backup that Guinto consented to a search of the car.

Defendants contend, in related fashion, that Guinto's consent was coerced unlawfully because the sheer repetition of Bennett's request made it apparent that "this particular trooper did not intend to relent with his request or release the car or the defendants until the trooper had searched the car to his satisfaction." Certainly, Bennett showed dogged persistence in trying to obtain consent, and his testimony shows that he intended to remain at the door of the vehicle until defendants consented to a search or a backup officer arrived. Thus, the consent to search was obtained at a time when defendants were not free to leave.

That, however, is hardly dispositive of the voluntariness of consent, given that consent was obtained during the course of a *lawful* stop.[6] *See, e.g., State v. Charlesworth/Parks*, 151 Or App 100, 114, 951 P2d 153 (1997), *rev den*, 327 Or 82 (1998); *State v. White*, 130 Or App 289, 291, 881 P2d 169 (1994). In *Charlesworth/Parks*, we reversed a trial court's determination that the defendant's consent had been involuntary. There, the defendant consented to a search of his car after his car had been lawfully blocked in by a police car and he had been ordered from the car at gunpoint and handcuffed. In holding that the consent to search was voluntary, we noted that the defendant "had had considerable experience with the criminal justice system" and that "he knew he had the right to refuse to consent to the search." *Id.* at 114.

Similarly, in *White*, at the time that the defendant consented to search, he had been lawfully detained, asked to

---

[6] Of course, a very different analysis applies when consent is obtained after an unlawful stop. *See generally State v. Hall*, 339 Or 7, 115 P3d 908 (2005).

step out of his car, and handcuffed. We agreed with the state that the consent was voluntary:

> "Defendant was confronted by one officer on a public street. No weapons were displayed during the encounter, and there was no testimony that the officer threatened defendant or used physical force in any way. The trial court found that the entire contact was low-key and without hostility, and there is evidence to support that finding. The fact that defendant was in handcuffs when he consented does not render the consent involuntary *per se*. There is nothing in the record to indicate that the officer intimidated or coerced defendant into consenting in any way."

*Id.* at 293 (citation omitted). *See also State v. Bea*, 318 Or 220, 230, 864 P2d 854 (1993) (consent given after the defendant had been lawfully arrested and handcuffed was voluntary, where encounter was in daylight hours on a public street, no weapons were displayed, and there was no use of physical force against the defendant).

Here, the circumstances, when viewed in their totality, were considerably less "coercive" than those in *Charlesworth / Parks* (where weapons were displayed and the defendant was in handcuffs), *White* (where the defendant was in handcuffs), and *Bea* (where the defendant was handcuffed and arrested). In contrast, Guinto consented to the search while sitting, unrestrained, in the car, less than five minutes into a lawful, albeit somewhat stressful, traffic stop. The encounter was beside a public highway during daylight hours, and Bennett's interaction with defendants was polite—he did not raise his voice, draw a weapon, or employ any threats or promises.[7] He simply requested consent—and then radioed for backup.

---

[7] Here, at most, defendants might have inferred that the traffic stop could end sooner if they consented to a search of the car for weapons. But nothing that Bennett said or did indicated that defendants would receive any benefit, or be subjected to any detriment, based on whether they consented. *Accord State v. Rodal*, 161 Or App 232, 241, 985 P2d 863 (1999) (concluding that officers' statements did not render the defendant's consent involuntary where officers had probable cause to believe that marijuana was growing on the defendant's property and, in seeking consent to search, told the defendant that they had probable cause to obtain a warrant but, if he consented to the search, the process would be shorter and he would be less likely to go to jail).

Under the totality of the circumstances, Bennett's words—however persistent—and actions were not so coercive as to render Guinto's consent involuntary. We thus affirm the trial court's determination that the warrantless search of the car and its contents, including the luggage, did not violate Article I, section 9, of the Oregon Constitution.

■■ Defendants also argue that the consent to search the car was not voluntary and the evidence should have been suppressed pursuant to the Fourth Amendment to the United States Constitution. The federal test, as articulated by the Court in *Schneckloth v. Bustamonte*, 412 US 218, 248-49, 93 S Ct 2041, 36 L Ed 2d 854 (1973), is essentially the same as the test under the Oregon Constitution, and requires the state to prove that "the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances[.]" Because voluntariness of consent is a question of fact under the Fourth Amendment, we will not disturb the trial court's finding unless it is unsupported by the record or clearly erroneous. *State v. Bowen*, 137 Or App 327, 331, 904 P2d 1076 (1995), *rev den*, 323 Or 74 (1996) (citing *Schneckloth*, 412 US at 227).

Defendants' arguments under the Fourth Amendment, which they support by brief reference to persuasive authorities from other jurisdictions, depend on the premise that Bennett repeatedly sought consent to search *after consent had been explicitly refused*. As noted above, however, the record does not support that assertion. *See* 211 Or App at 304. Again, when viewed under *Ball v. Gladden*, the record establishes that Guinto never responded to Bennett's requests for consent by refusing consent. Rather, the record shows only that Guinto, in response to Bennett's questions about the presence of weapons, repeatedly denied that there were any weapons in the car.

A detailed deconstruction of the authorities that defendants invoke would not benefit the bench and bar.[8]

---

[8] *See United States v. Raibley*, 243 F3d 1069, 1075-76 (7th Cir), *cert den*, 534 US 876 (2001); *United States v. Pulvano*, 629 F2d 1151 (5th Cir 1980); *State v. Jackson*, 110 Ohio App 3d 137, 143, 673 NE2d 685 (1996); *State v. O'Neill*, 148 Wash 2d 564, 62 P3d 489 (2003).

Suffice it to say that the cases do not involve facts analogous to those presented here. Nothing in the Fourth Amendment case law cited by defendants leads us to believe that the issue presented should be resolved differently under the Fourth Amendment to the United States Constitution than under Article I, section 9, of the Oregon Constitution.

Affirmed.