AOYAGI, J.
*64 Petitioner was arrested for driving under the influence of intoxicants (DUII) and violating a restraining order. The arrest took place in petitioner's bedroom in a house where he was temporarily residing. After arresting him, the police asked petitioner to consent to a breath test, which he refused. As a result of that refusal, the Driver and Motor Vehicle Services Division of the Department of Transportation (DMV) proposed to suspend petitioner's driving privileges for three years. Petitioner requested a hearing before an administrative law judge (ALJ). After the hearing, the DMV ordered the proposed suspension. The circuit court affirmed the DMV's order. On appeal, petitioner raises a single assignment of error. As he did below, petitioner argues that the police violated his rights under Article I, section 9, of the Oregon Constitution by entering his bedroom without a warrant and without valid consent and that, therefore, the suspension is invalid.[1] The state counters that the police had valid consent from the homeowner. For the following reasons, we reverse.
FACTS
We summarize the relevant historical facts consistently with the unchallenged findings in the final order. Brown v. DMV , 157 Or. App. 167, 169, 967 P.2d 919 (1998).
On a June night, the police received reports that petitioner had visited his wife's home in violation of a restraining order and that he was visibly intoxicated and driving. Around 1:00 a.m., Officer Voll located petitioner's parked car outside the home of Nisbet. Nisbet lived in the two-story, five-bedroom house with his wife and four children, and petitioner was living there temporarily. Voll and a cover officer, Officer Emile, approached the house together.
*65 After about 15 minutes, the officers made contact with *1214 Nisbet's 18-year-old daughter, who let them into the house.[2]
After entering the house, Voll asked to talk to Nisbet. In Voll's words, he wanted Nisbet to be "aware, number one, that we were in the home, so that we continued to essentially have that consent from the homeowner" and also wanted "to help make that transition in making contact with [petitioner] a little bit easier." The daughter, accompanied by the officers, went upstairs and knocked on the closed door of the master bedroom. Nisbet woke up, opened the door, and found his daughter and two police officers with flashlights in the hallway. Voll recalled that another young girl also came out of one of the bedrooms.
Voll wanted Nisbet's consent to remain in the house but did not affirmatively request consent; rather, he "operate[d] on the assumption" that, once Nisbet was awake and aware of the officers' presence, "by not kicking [them] out he was consenting [for them to be] in the residence." The officers explained to Nisbet that they "needed to speak to know where [petitioner] was located." In response, Nisbet pointed to the guest bedroom, which was located next to the master bedroom. As the ALJ found, the officers then "asked [Nisbet] to go in and get [petitioner], probably to avoid confrontation and keep things peaceful." According to Voll, the officers expressed concern to Nisbet about petitioner's "level of hostility" and "asked [Nisbet] to kind of let [petitioner] know to keep cool and hopefully kind of ease things-ease that transition between talking to [Nisbet] to talking to [the police]."
Nisbet walked into the guest bedroom, woke up petitioner, and spoke with him. After about three minutes, Voll "popped [his] head" into the room and asked Nisbet, "Are we good?" Nisbet responded something like "yeah."
At that point, the two officers walked into the bedroom, advised petitioner of his Miranda rights, and questioned him as he sat on the bed. Voll informed petitioner *66 that he was under arrest for violating the restraining order and for DUII.
After his arrest, petitioner refused several requests to submit to a breath test. Upon receiving notice of petitioner's refusal to submit to a breath test in connection with a DUII arrest, the DMV proposed to suspend petitioner's driving privileges for three years, pursuant to ORS 813.100 and ORS 813.410.[3] Petitioner requested a hearing. Among other things, petitioner argued that he was unlawfully arrested because the police entered his home without a warrant or a valid exception to the warrant requirement, in violation of Article I, section 9, of the Oregon Constitution.
The ALJ rejected petitioner's constitutional argument, ruling that Nisbet's daughter had voluntarily consented to the officers' initial entry into the house and that Nisbet had voluntarily consented to the officers' entry into petitioner's bedroom.
For the entry into the bedroom, the ALJ found that, on the night of his arrest, petitioner had been staying in Nisbet's guest bedroom for approximately two weeks. While he was staying there, Nisbet stayed out of the guest bedroom to respect petitioner's privacy. Nisbet's wife, however, would go into the room from time to time to vacuum and make the bed. Based on those facts, the ALJ concluded that Nisbet had authority to consent to the police entering the guest bedroom:
"[B]y allowing Petitioner to stay in his guest bedroom temporarily, Mr. Nisbet did not surrender his common authority and control over the room. Petitioner was a guest in Mr. Nisbet's home and, as evidenced by Mrs. Nisbet's access to the room, retained the freedom to allow anyone *1215 else access to the room at any time. The entry into the home and guest room was lawful."
*67 Further, the ALJ concluded that Nisbet had voluntarily consented to the police entering the guest bedroom. The ALJ reasoned:
"The Court of Appeals' decision in State v. Briggs , 257 Or. App. 738 [, 307 P.3d 564, rev. den. , 354 Or. 386, 314 P.3d 964] (2013) is helpful in resolving this case. In Briggs , police pursued a suspected drunk driver to a hotel room. Police knocked on the door and a young woman answered. A police officer stated, 'I need to talk to the person that just ran in here.' He then asked whose room it was and she replied it was hers. Police then said, 'Well, where's the gentleman * * * that just ran in?' The woman stepped aside and motioned to the back of the room, 'He's in the back.' Police entered. The Court of Appeals held [that] the woman voluntarily consented to a search of the hotel room stating, 'Although [the officer's] statement, "I need to talk to the person who just ran in," was a declaration and not a question or a request, it was not a statement that would, in "ordinary social intercourse" convey to a listener that her only alternative was to permit the officer to enter.' Id . at 742 [307 P.3d 564].
"Here, according to the testimony of Mr. Nisbet, police told him 'they needed to know where [petitioner] was located' and he pointed to the guest bedroom door. Then, again according to Mr. Nisbet, 'They asked me to go in and get him' and he did so. As in Briggs , a listener in 'ordinary social intercourse' would not in these circumstances understand that entry into the guest bedroom was inevitable. Mr. Nisbet's going to the room, walking in, and then informing the officers that 'we're good' was a voluntary consent for police to enter the room."
On appeal, the circuit court affirmed the DMV's order. Petitioner now appeals to us. See ORS 813.450(1) - (3) (providing for appeal of an order of the Department of Transportation to the circuit court, which shall conduct its review without a jury and based on the record of the department's hearing, and further providing that "[a]ny party to the proceedings before the circuit court may appeal from the judgment of the court to the Court of Appeals").
ANALYSIS
Although this is an appeal from a judgment of the circuit court, we review the DMV's order.
*68 Brown , 157 Or. App. at 172, 967 P.2d 919. We are bound by any factual findings supported by evidence. State v. Jepson , 254 Or. App. 290, 294, 292 P.3d 660 (2012). "Whether those facts establish that the consent was voluntary, however, is a legal issue that we review independently." Id . If we conclude that the DMV "erroneously interpreted a provision of law and that a correct interpretation compels a particular action," we may set aside or modify the order, or we may remand to the DMV for further action under a correct interpretation of the law. ORS 813.450(4)(a).
Article I, section 9, of the Oregon Constitution protects people against unreasonable searches and seizures of their persons, houses, papers, and effects. A warrantless search violates Article I, section 9, unless it is justified by an exception to the warrant requirement, and consent is one such exception. State v. Dunlap , 215 Or. App. 46, 53, 168 P.3d 295 (2007). "[W]hen the state relies on the consent of a third party to justify a search * * *, the third party must have actual authority to consent." State v. Ready , 148 Or. App. 149, 152-53, 939 P.2d 117, rev. den. , 326 Or. 68, 950 P.2d 892 (1997). It is the state's burden to prove "that someone having the authority to do so voluntarily consented to the entry." State v. Stanley , 287 Or. App. 399, 406, 404 P.3d 1100 (2017), rev. den. , 362 Or. 508 (2018). Consent may be manifested by words, conduct, or a combination of the two. See Briggs , 257 Or. App. at 742, 307 P.3d 564. "The test for voluntariness is whether, under the totality of the circumstances, the consent was given by an act of a [person's] free will, as opposed to resulting from express or implied coercion." Jepson , 254 Or. App. at 294, 292 P.3d 660 ; see also State v. Powell , 288 Or. App. 660, 668, 406 P.3d 1111 (2017) (the state must prove that, "under the totality of the circumstances, the consent *1216 was the product of the [person's] free will").
In determining whether a person voluntarily consented to a police search, "courts pay close attention to the words used by the officer requesting consent." Stanley , 287 Or. App. at 407, 404 P.3d 1100. "When [the officer's] words do not provide the listener with a reasonable opportunity to choose to consent, or when those words leave the listener with the impression that a search is inevitable, absent strong countervailing factors, we have consistently found acquiescence rather than consent." Briggs , 257 Or. App. at 742-43, 307 P.3d 564. "A defendant's 'mere *69 acquiescence' to police authority does not constitute voluntary consent." Stanley , 287 Or. App. at 407, 404 P.3d 1100 (quoting State v. Berg , 223 Or. App. 387, 392, 196 P.3d 547 (2008), adh'd to as modified on recons. , 228 Or. App. 754, 208 P.3d 1006, rev. den. , 346 Or. 361, 211 P.3d 930 (2009) ).
In this case, petitioner argues that the police entered his bedroom without a warrant or valid consent and thereby violated his rights under Article I, section 9. Specifically, petitioner argues that Nisbet did not have actual authority to consent to the officers' entry into the bedroom or, alternatively that, even if he did, Nisbet did not voluntarily consent but merely acquiesced. In response, the state argues that Nisbet had actual authority as the homeowner and that he voluntarily consented to the officers' entry into petitioner's bedroom. The state argues that the officers' conduct-including asking for Nisbet's assistance in retrieving petitioner, waiting in the hallway for several minutes, Voll poking his head through the doorway without stepping into the bedroom, and getting verbal confirmation that they were "all good" before entering the bedroom-conveyed that the officers would not enter without Nisbet's consent. And, the state asserts, Nisbet gave that consent when he responded affirmatively to Voll's question, "Are we good?"
We assume without deciding that Nisbet had actual authority to consent to the officers' entry into petitioner's bedroom and, because it is dispositive, proceed directly to the second question: whether the state proved voluntary consent.
Briggs illustrates a voluntary-consent situation. In that case, officers responded to an anonymous report that a "highly intoxicated" male was "driving erratically" in the parking lot of a hotel. Briggs , 257 Or. App. at 740, 307 P.3d 564. When the officers arrived at the hotel and tried to talk to the defendant, he ran to a nearby room, "banged on the door, and then went inside and closed the door." Id. at 741, 307 P.3d 564. The officers knocked on the door, and a woman answered. An officer said, "I need to talk to the person that just ran in here." Id. The officer then asked whose room it was, and the woman explained that she had rented it for a party. The officer asked, "Well, where's the gentleman * * * that just ran in?" Id. (ellipsis *70 in original). "The woman stepped aside, motion[ed] to the back of the room, and said, 'He's in the back.' " Id. An officer entered the room, located the defendant, and took him outside for questioning and field sobriety tests.
In concluding that the woman had voluntarily consented to the officer entering her hotel room, we recognized that the officer's first statement-"I need to talk to the person that just ran in here"-was a declaration, not a question or request. Id. at 743, 307 P.3d 564. We concluded that it was nonetheless not a statement that, "in ordinary social intercourse," would convey to a listener that the only alternative was to permit the officer to enter the room. Id. at 743-44, 307 P.3d 564 (internal quotation marks omitted). Rather, the woman had a choice: she could invite the officer in, or she could leave him outside and go tell the defendant that the officer wanted to speak to him. Id. at 744, 307 P.3d 564. The latter was "the more typical response" that one might expect "from the host of a crowded social occasion when a police officer expresses a desire to have a conversation with a guest," but she voluntarily chose the former and invited the officers to enter. Id.
By contrast, in Jepson , officers were investigating a child-abuse report. 254 Or. App. at 292, 292 P.3d 660. During a conversation at the home of the defendant and his girlfriend, the girlfriend admitted that they had two guns in the house. An officer questioned *1217 whether they were allowed to have firearms, ultimately saying that she would check and come back if there was a problem. An hour later, the officer returned and told the defendant and his girlfriend that they were not allowed to have guns. Id. at 292-93, 292 P.3d 660. The officer said, "[W]e're going to have to take the firearms," and another officer asked where the guns were located. Id. at 293, 292 P.3d 660 (brackets in original). The girlfriend gave detailed instructions for finding the guns in the bedroom. The defendant was later charged and convicted of two counts of felon in possession of a firearm. On appeal, we held that the officers had not received voluntary consent to search the house. Id. at 296, 292 P.3d 660. The officer's statement that "we're going to have to take the firearms" was not a request for consent but, rather, an unconditional statement that did not invite a response other than acquiescence. Id. And the girlfriend telling the police where the guns were located did not establish voluntary *71 consent to enter the house, because nothing about asking "where the guns were" conveyed that the officers "would not, and could not," enter the house without consent. Id .
Similarly, in State v. Freund , 102 Or. App. 647, 649, 796 P.2d 656 (1990), the sheriff's office got an anonymous tip about the defendant growing marijuana. When officers arrived at the house, one of them told the defendant that he "was there to pick up the marijuana plants that she was growing." Id . The defendant seemed shocked and did not say anything. The officer repeated what he had said and added that he "wanted to do it as calmly [and] efficiently as possible." Id. (brackets in original). The defendant "pointed to an area behind the house as she replied that she had some marijuana plants growing there for her personal use." Id . The officer then asked her "if she would take [the officers] to them to show [the officers] where they were." Id. The defendant agreed and "walked up behind the house." Id . She showed the officers nine marijuana plants in her yard. Id .
The defendant was charged with manufacturing, possessing, and delivering marijuana. She moved to suppress the marijuana plants (and other subsequently found evidence). The trial court denied the motion, and the defendant was convicted. We reversed. Recognizing that "the case stands or falls on the issue of defendant's consent to the search of her yard," we concluded that the state had not established voluntary consent. Id . at 650, 652, 796 P.2d 656. Although the officers knew that they needed consent and intended to obtain it, their words did not convey that they were requesting consent that the defendant could deny. Id. at 652, 796 P.2d 656. The officer's initial statement that he was there to pick up the marijuana plants "[could] not be characterized as a request for consent." Id . That statement "[did] not invite a response other than acquiescence." Id. "In contrast," the officer's next statement, that he wanted to do it calmly, was "supplicatory and [did] invite a response," but, taken in conjunction with the first statement, "told defendant that she had no choice whether a search would occur; her only option was whether the search and seizure was to be 'calm and efficient.' " Id . In that context, the "[d]efendant merely chose the option favoring calmness and efficiency when she pointed to where marijuana could be found." Id . The same was *72 true of the defendant agreeing to show the officers where the plants were located and leading them to that part of her yard. "Again, defendant was likely to conclude that the choice merely was between cooperating or not cooperating with a search that was bound to occur." Id .
This case is more like Freund and Jepson than it is like Briggs . The state did not meet its burden to prove that, under the totality of the circumstances, Nisbet's affirmative response to the question "Are we good?" constituted voluntary consent for the officers to enter petitioner's bedroom. At most, the state established mere acquiescence to police authority. That is because the officers' words and conduct did not provide Nisbet with "a reasonable opportunity to choose to consent"-or not-to the officers' entry into petitioner's bedroom. Briggs , 257 Or. App. at 742, 307 P.3d 564. In reaching that conclusion, we "pay close attention to the words used by the officer requesting consent." Stanley , 287 Or. App. at 407, 404 P.3d 1100. We also must consider the context in which *1218 the officer said those words. See id. at 406, 404 P.3d 1100 (test for voluntariness requires consideration of the totality of the circumstances); Jepson , 254 Or. App. at 296, 292 P.3d 660 (evaluating alleged request for consent in context of the officer's preceding statement).
Here, Nisbet's interaction with the police began outside his bedroom door, on the second floor of his house, in the middle of the night, when he was awakened from sleep by his 18-year-old daughter and two police officers with flashlights standing in the hallway. The officers did not ask Nisbet for his consent to be in the house; rather, Voll "assumed" that Nisbet would "kick[ them] out" if he objected to their presence.
Once the officers contacted Nisbet, they made three specific statements of record to him. Voll first told Nisbet that he and Emile needed to know where petitioner was located in the house. The state does not contend that that was a request for consent to search, and we agree that it was not. Voll's second statement to Nisbet was his request that Nisbet "go in and get" petitioner. Nisbet understood that request to have been made-and the ALJ found that request to have been made-"probably to avoid confrontation and keep things peaceful." That finding is consistent *73 with Voll's testimony that he told Nisbet that the officers were concerned about petitioner's "level of hostility" and wanted Nisbet to tell petitioner "to keep cool and hopefully kind of ease things-ease that transition between talking to [Nisbet] to talking to [the officers]." In other words, Voll's second statement was intended and understood as a request for Nisbet's assistance to "go in and get" petitioner and to "keep things peaceful," not as a request for consent for the officers to enter petitioner's bedroom.
The last statement that Voll made was when Voll "popped [his] head" into petitioner's bedroom and asked, "Are we good?" while Nisbet was talking with petitioner. That happened about three minutes after Nisbet entered petitioner's room. It is the third statement on which the state relies, arguing that "Are we good?" was a request for consent for the officers to enter petitioner's bedroom that Nisbet granted by responding something like "yeah." But Voll's question did not provide Nisbet with a reasonable opportunity to choose freely whether to allow police officers into petitioner's bedroom. By the time that Voll asked "Are we good?" two officers were already in a private part of Nisbet's house, without having requested any consent from Nisbet. As soon as the officers had determined petitioner's location, they expressed concern that he might react hostilely to police-thus indicating their intent to contact him-and requested Nisbet's assistance to keep the situation "calm"-further indicating that contact was inevitable and that it was just a question of whether it would be "calm." Finally, the officers asked only that Nisbet "go in and get" petitioner. But, after several minutes passed, Voll "popped [his] head" into petitioner's room uninvited and asked, "Are we good?"
Under those circumstances, a listener likely would understand Voll to be seeking confirmation that petitioner was calm, not requesting consent to enter his bedroom-something that had not been discussed up to that point.[4]
*74 But, even if a listener would understand the question "Are we good?" as a predicate to Voll and Emile entering the room, the phrasing and timing of the question failed to give Nisbet a reasonable opportunity to choose whether to consent. Nothing about "Are we good?" conveys that the listener is free to grant or deny entry into the room, especially when Voll had already *1219 "popped [his] head" in. Voll's words and conduct carried an impression of inevitability and invited no response but acquiescence. Indeed, as a practical matter, given that the officers had voiced concern to Nisbet about petitioner's "hostility level" and had tasked Nisbet with "calming" him to keep the situation "peaceful," it is difficult to imagine that anyone in Nisbet's position would feel free to respond, "No, we're not good."
This case is distinguishable from Briggs , because, when the officers in that case told the woman who opened the door that they needed to talk to the man who had just run into her room, and inquired where he was, the officers did nothing to indicate that they intended to enter the room regardless of her response. 257 Or. App. at 743-44, 307 P.3d 564. It was the woman who invited them into her room by stepping aside, motioning, and saying, "He's in the back." Id. at 741, 744, 307 P.3d 564. Under the circumstances, she easily could have said that she would go get him, if she did not want the officers in her room, and indeed that would have been the "more typical" response. Id. at 744, 307 P.3d 564. Instead, she chose to invite them in. Id.
Here, by contrast, the officers' words and conduct conveyed that they intended to talk to petitioner and that the only question was whether petitioner would be "calm" when they did so. This case is similar to Freund in that regard. Like the officers in this case, the officers in Freund realized that they needed consent to search the defendant's property. 102 Or. App. at 652, 796 P.2d 656. However, their words and conduct failed to communicate that the defendant had a choice whether to *75 give it. Id . Rather, in context, their words and conduct conveyed to the defendant that "her only option was whether the search and seizure was to be 'calm and efficient.' " Id . And, in that context, when the defendant pointed and led the officers to her marijuana plants, she did not do so voluntarily of her own free will but "merely chose the option favoring calmness and efficiency." Id . She chose "between cooperating or not cooperating with a search that was bound to occur." Id . The same is true here. As in Jepson and Freund , nothing about the officers' words or conduct would suggest to a listener that the officers "would not, and could not," enter petitioner's bedroom without voluntary consent from Nisbet. Jepson , 254 Or. App. at 296, 292 P.3d 660. Rather, as in Freund , the officers presented the situation as one in which they intended to contact petitioner, and it was only a question of whether the encounter would be "calm" or "hostile." That was a particularly stark choice for Nisbet when it was the middle of the night and his wife and four children had bedrooms on the same floor as petitioner's room.
In sum, the officers never asked Nisbet directly for consent to enter petitioner's bedroom; Nisbet did nothing of his own accord to invite the officers into petitioner's bedroom; and, under the totality of the circumstances, Voll's question "Are we good?" did not provide Nisbet with a reasonable opportunity to choose whether to allow or deny the officers entry into the bedroom. Because the state failed to meet its burden to prove the consent exception to the warrant requirement, petitioner's arrest violated Article I, section 9, of the Oregon Constitution and the breath test requests were invalid. Accordingly, we conclude that the DMV erred in suspending petitioner's driving privileges, and we therefore set aside petitioner's license suspension.
Reversed.

A request for a breath test is invalid if the underlying arrest is unconstitutional, and the DMV may not suspend a person's driving privileges based on the results or refusal of an invalid breath test request. See Pooler v. MVD , 88 Or. App. 475, 478, 746 P.2d 716 (1987), aff'd , 306 Or. 47, 755 P.2d 701 (1988) (decided under former ORS 487.805(1) (1983), renumbered as ORS 813.100 (1985), and former ORS 482.541 (1983), renumbered as ORS 813.410(4) (1985) ).

On appeal, petitioner does not contest that the officers' initial entry into the house was lawful.

Under ORS 813.100(1), anyone "who operates a motor vehicle upon premises open to the public or the highways of this state shall be deemed to have given consent, subject to the implied consent law, to a chemical test of the person's breath * * *." If a person refuses a breath test under qualifying circumstances, "the person's driving privileges are subject to suspension under ORS 813.410." ORS 813.100(3) ; see ORS 813.410(6)(c) (providing for suspension of a person's driving privileges when "[t]he person refused a test under ORS 813.100").

Although expressly recognizing that the question before the court-whether Nisbet voluntarily consented to the officers' entry into petitioner's bedroom or merely acquiesced to it-is a question of law, the state asserts briefly in a footnote that the ALJ made a finding of fact regarding Nisbet's subjective intent in answering affirmatively to the question "Are we good?" The state cites the statement in the DMV's order that "Mr. Nisbet's going to the room, walking in, and then informing the officer's that 'we're good' was a voluntary consent for police to enter the room." That statement is in the opinion section of the order, not the findings of fact, and is plainly a legal conclusion that the state had proved voluntary consent, not a factual finding. The ALJ applied the established case law cited by the parties, and, consistently with that case law, made no findings regarding Nisbet's subjective intent.