Submitted April 29, 2020; conviction on Count 1 reversed and remanded, remanded for resentencing, otherwise affirmed January 21, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DONALD LEROY JORDAN,
*Defendant-Appellant.*

Lane County Circuit Court
18CR18044; A169117

481 P3d 1017

Defendant challenges a judgment of conviction for possession of methamphetamine and failure to appear on a criminal citation. He argues that the trial court erred in denying his motion to suppress because his consent to the search was not voluntary. He further contends that he is entitled to suppression of the methamphetamine that was discovered in the search and the criminal citation that was issued, as evidence produced from the unlawful search. *Held*: The state failed to meet its burden to establish that defendant's consent was voluntary when considering the coercive nature of the encounter and defendant's words and conduct, and the trial court erred in denying defendant's motion and failing to suppress the methamphetamine. However, defendant was not entitled to the suppression of the citation because his decision to fail to appear on the court date listed in the citation, which constituted a criminal offense, attenuated the taint from the unlawful police conduct.

Conviction on Count 1 reversed and remanded; remanded for resentencing; otherwise affirmed.

Maurice K. Merten, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Kyle Krohn, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Michael A. Casper, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Shorr, Judge, and James, Judge.

ORTEGA, P. J.

Conviction on Count 1 reversed and remanded; remanded for resentencing; otherwise affirmed.

## ORTEGA, P. J.

Defendant was stopped by a police officer and eventually assented to a search, which led to the discovery of methamphetamine in his pants pocket. The officer cited defendant for methamphetamine possession, and the citation included a date for defendant to appear in court. Defendant failed to appear and ultimately was convicted of methamphetamine possession, ORS 475.894 (Count 1), and failure to appear on a criminal citation, ORS 133.076 (Count 2). In a single assignment of error, defendant challenges that judgment and argues that the trial court erred in denying his motion to suppress because his consent to the search was not voluntary. Defendant further contends that he is entitled to suppression of the methamphetamine that was discovered in the search and also the criminal citation that was issued, as evidence produced from the unlawful search. We conclude that defendant's consent to the search was not voluntary and that the methamphetamine evidence should be suppressed. However, we disagree that defendant is entitled to suppression of the criminal citation. We therefore reverse and remand on Count 1 and affirm on Count 2.

Detective Sites, the arresting officer, testified at the pretrial hearing on defendant's motion to suppress, and a dashboard-camera video which captured his interaction with defendant was admitted into evidence. We recite the evidence based on Sites's testimony at the hearing and the dash-cam video. The trial court relied on both Sites's testimony and the video, and the parties' dispute about defendant's voluntary consent centers on the conclusions that can be drawn from that evidence.

At around 1:30 a.m., Sites was patrolling downtown Eugene when he saw defendant, who was wearing a rain poncho and standing by a shopping cart in a covered residential parking garage posted with no-trespassing signs. The parking area is a known drug area, and residents regularly complained to police about drug activity. Sites, in uniform, stepped out of his patrol car, approached defendant, and informed him that he was trespassing. Sites knew defendant from previous contacts and noticed that defendant's demeanor was more agitated and tense than usual. Sites,

a trained Drug Recognition Expert, saw signs that defendant was impaired by a stimulant. He also noticed a syringe plunger cap at defendant's feet and believed that, in addition to having probable cause for trespassing, he had reasonable suspicion that defendant was in possession of drugs or drug paraphernalia.

Sites then asked defendant if he had any drugs on him and if Sites could search him. Defendant responded that he did not and searched his own pockets, which Sites took to be the behavior of someone trying to hide something. After 20 seconds had passed, Sites moved closer to and leaned down over defendant and positioned himself to begin searching while asking a second time, "All right, is it all right if I check you out really quick?" Defendant responded "Huh," and Sites, while still positioned to search, moved in even closer, leaned even further over defendant, and asked a third time, "Is it all right if I check you out really quick?" Defendant responded, "Like what?" As defendant pulled at the front of his poncho while Sites's hands were holding the poncho, Sites asked a fourth time, "Is it all right if I check?" Defendant responded that Sites could go ahead.[1] Sites testified that defendant also "positioned himself to allow the search" but did not remember whether defendant lifted his arms. Sites began to search defendant and, while doing so, confronted defendant about a prior methamphetamine charge, which defendant denied having and they debated. Approximately 35 seconds into the search, defendant stated, "This is violating my rights." Sites did not believe that defendant had withdrawn his consent but suspended the search out of caution.

Sites continued to discuss with defendant his belief that defendant possessed drugs, pointing out the syringe plunger cap at defendant's feet. Defendant removed his poncho and jacket and displayed his arms to show Sites that he was not an IV drug user. Sites asked defendant a fifth time for his consent to search, and defendant responded, "No, I ain't fucking, no, you can arrest me then." Sites responded,

---

[1] Although defendant's verbal response is noted as "(indiscernible)?" on the video transcript and cannot be heard when listening to the video, Sites testified that defendant responded by giving verbal consent, which was not disputed below or on appeal.

"Is that—if that's how you want to do it." Eventually, defendant said, "[Y]ou can search me if you want, but *** that's violating my rights." Up to that point, defendant sometimes joked with Sites, including indicating that if Sites took him to jail he wanted to take his TV with him. However, defendant also expressed frustration with Sites's requests for consent to search, pacing back and forth and declaring, "This is ridiculous, man, it is."

Sites then asked defendant what he had in his pockets, and defendant responded by holding his arms out to the side, patting his pockets, and then lifting his arms in the air. Sites then walked toward defendant while asking again, "Can I check?" Defendant then dropped his arms. Sites removed the glove from his right hand and walked toward defendant's backside while defendant turned his body away from Sites so that his back was facing Sites's front. Sites removed his glove because he interpreted defendant turning away from him[2] and holding his "arms out" as giving nonverbal consent to search and because the glove was thick and removing it enables him to "check a smaller pocket, like the *** coin pocket." However, given that defendant had recently asserted that Sites was violating his rights, he continued to seek verbal confirmation to search. For about five seconds, Sites stood at defendant's backside, in his "immediate proximity," positioned to search and waiting for defendant's verbal consent until defendant nodded his head up and down. Sites asked, "Yeah?" and defendant responded, "Do it, do it." Sites did not have to reposition himself to reach into defendant's pockets, where he discovered methamphetamine. Sites served defendant with a citation to appear in court 22 days later, but defendant failed to appear. He ultimately was indicted by a grand jury for methamphetamine possession and failure to appear.

Before trial, defendant filed a motion to suppress "any and all evidence" from the search, arguing that

_____

[2] Although Sites's testimony—that he removed his glove because he interpreted defendant turning away as communicating nonverbal consent—implies that defendant turned away before the glove was removed, the video reveals that Sites in fact removed his glove before defendant began to turn away. However, we need not consider that discrepancy in our analysis because it would not affect the outcome.

defendant had merely acquiesced, not voluntarily consented to the search. The trial court denied defendant's motion to suppress based on Sites's testimony and viewing the video, determining that "by words and conduct," defendant "clearly, voluntarily consented to the search of his person." Following a stipulated facts trial, defendant was convicted of possession of methamphetamine and failure to appear on a criminal citation.

On appeal, defendant argues that the circumstances surrounding his interaction with Sites, the words that Sites used, and defendant's responses all show that defendant did not voluntarily consent to the search. Specifically, defendant argues that Sites repeatedly accused him of trespassing, communicated that he suspected defendant of drug possession, and persistently questioned and asked to search defendant despite his repeated expressions of frustration with the encounter, including two complaints that Sites was violating his rights. Thus, according to defendant, the surrounding circumstances gave defendant "ample reason to believe that his arrest and search was likely if not inevitable." Further, defendant argues that his words and actions showed that he was not voluntarily cooperating with Sites, including his multiple attempts to limit and control the search, twice interrupting Sites's attempts to search him by telling him that Sites was violating his rights, telling Sites that he could search him only if he arrested him, and that, despite his initial resistance, he only reluctantly gave way following Sites's persistent conduct. Thus, defendant argues, the state failed to establish that he actually intended to give consent. *See State v. Blair*, 361 Or 527, 535, 396 P3d 908 (2017) (discussing "actual consent" as the "touchstone of the consent exception under Article I, section 9").

The state disagrees that Sites's words or conduct communicated that the search was inevitable or required and argues that, on the contrary, his words and conduct communicated that he would not search without defendant's consent. The state emphasizes that Sites's interaction with defendant was polite, respectful, and calm and that Sites did not raise his voice or draw his weapon and did not place defendant in handcuffs or in his patrol car or take any other actions that would arguably create a coercive atmosphere.

The state acknowledges that Sites "repeatedly asked for defendant's consent to search," but argues that Sites also "repeatedly made clear that he would not in fact search defendant without that consent." And, according to the state, defendant first gave nonverbal consent by "positioning himself so that Sites could pat him down" and then, before Sites began the search, gave his verbal consent when he told Sites, "Do it, do it." Therefore, the state contends, the trial court did not err in denying defendant's motion to suppress.

We review a trial court's decision to deny a defendant's motion to suppress for legal error. *State v. Vasquez-Villagomez*, 346 Or 12, 23, 203 P3d 193 (2009). In reviewing the voluntariness of defendant's consent, we are bound by the trial court's findings of historical fact if there is evidence in the record to support them. *State v. Venturi*, 166 Or App 46, 50, 998 P2d 748, *rev den*, 330 Or 375 (2000). "Ultimately, the determination about whether a consent to search is voluntary is a legal issue that we review independently, based on the trial court's findings that are supported by the evidence." *Id.* (citing *State v. Stevens*, 311 Or 119, 135, 806 P2d 92 (1991)).

Under Article I, section 9, warrantless searches are unreasonable "unless falling within one of the few specifically established and well-delineated exceptions to the warrant requirement." *State v. Baker*, 350 Or 641, 647, 260 P3d 476 (2011) (internal quotation marks omitted). One such exception is consent. *State v. Paulson*, 313 Or 346, 351, 833 P2d 1278 (1992). Under that exception, the state has the burden to prove by a preponderance of the evidence "that someone having the authority to do so voluntarily gave the police consent to search the defendant's person or property." *Id.*

"The test for voluntariness is whether, under the totality of the circumstances, the consent was given by an act of a defendant's free will as opposed to resulting from express or implied coercion." *State v. Jepson*, 254 Or App 290, 294, 292 P3d 660 (2012). Consent may be explicit, or it "may be manifested by conduct." *State v. Martin*, 222 Or App 138, 142, 193 P3d 993 (2008), *rev den*, 345 Or 690 (2009). Further, the person must "*actually* intend[] to give consent

to the intrusion." *Blair*, 361 Or at 535 (emphasis in original). "[A] defendant's mere acquiescence to police authority does not constitute consent." *Jepson*, 254 Or App at 294 (internal quotation marks omitted). A person acquiesces to police authority when the "individual is not given a reasonable opportunity to choose to consent or when he or she is informed that a search will occur regardless of whether consent is given." *Id.* at 294-95 (internal quotation marks omitted).

In assessing whether defendant has voluntarily consented or merely acquiesced to police authority, we consider the officer's words to determine whether those words provided the defendant with an opportunity to choose to consent, or whether those words left defendant with the impression that a search was inevitable. *Id.* at 295-96; *State v. Freund*, 102 Or App 647, 652, 796 P2d 656 (1990). A defendant's response to an officer's request to search also bears on whether the consent was voluntary. *See Martin*, 222 Or App at 140-44 (concluding that the defendant's "actions did not invite" the officers inside her home). In determining whether consent was voluntary, we also look to whether physical force was used or threatened, whether weapons were displayed, whether the consent was obtained in public, the officer's tone of voice, whether the person giving consent is under investigation, the number of officers present, and "whether the atmosphere surrounding the consent is antagonistic or oppressive." *State v. Larson*, 141 Or App 186, 197-98, 917 P2d 519, *rev den*, 324 Or 229 (1996).

Here, in assessing the totality of the circumstances, we conclude that the state failed to meet its burden to establish that defendant's consent was freely and voluntarily given. We begin by evaluating the circumstances surrounding Sites's initial search of defendant, concluding that Sites's conduct up to that point communicated to defendant that a search would occur regardless of whether defendant consented. We acknowledge that Sites's choice of words—"Is it all right if I check you out?" and "Do you mind if I check?" which invited a "yes" or "no" response—would appear to be questions seeking consent and not mere acquiescence. *See Larson*, 141 Or App at 198-99 (officer's statement, "would you please open the door of the car on the van" invited a "yes"

or "no" response and not mere acquiescence). And, we have explained that "in the absence of compelling circumstances to the contrary, an officer's particular choice of language is highly significant in assessing whether a reasonable person would understand the officer's remarks to be so coercive as to render refusal to consent futile." *State v. Ry/Guinto*, 211 Or App 298, 306 n 5, 154 P3d 724, *rev den*, 343 Or 224 (2007). However, we do not view the officer's choice of words in isolation in determining the voluntariness of consent to search. *See State v. Stanley*, 287 Or App 399, 406, 404 P3d 1100 (2017) (test for voluntariness requires consideration of the totality of the circumstances); *Ry/Guinto*, 211 Or App at 306 n 5 ("[T]he particular phrasing of a purported request is not necessarily dispositive[.]"); *Freund*, 102 Or App at 652-53 (looking to officer's preceding statements as context in evaluating officer's alleged request for consent).

Although Sites's choice of words could be interpreted as seeking voluntary consent and not mere acquiescence, those words viewed in the context of Sites's conduct communicated a distinctly different message. That is so because each time Sites asked defendant if it was "all right if [he] check[ed him] out," Sites moved closer to, and leaned further down over, defendant while positioning himself to begin the search. By the time Sites made his fourth request to search—the question that elicited defendant's verbal assent—his hands were already on defendant's poncho. It is unlikely that a reasonable listener in defendant's position would feel free to refuse Sites's multiple requests for consent to search when standing alone in the early morning hours of a parking lot with an officer who, by the fourth request for consent to search, had already taken such substantial steps to begin the search. Rather, that conduct, viewed in context of the entire interaction up to that point, including Sites accusing defendant of committing crimes, communicated "that a search [would] occur regardless of whether consent is given." *Jepson*, 254 Or App at 294-95 (internal quotation marks omitted).

We come to a similar conclusion when evaluating the circumstances leading up to the initiation of the second search, which include the circumstances that preceded the initial search that we previously discussed. Sites's conduct

after he ceased the initial search—but viewed in context of what occurred preceding the initial search—communicated to defendant that any refusal to consent would have been futile. On that point, we make four observations.

First, Sites communicated to defendant that he was under investigation for a second crime—drug activity—when he confronted defendant with accusations of prior drug use during the initial search and then later questioned him about the syringe cap at his feet. *See Larson*, 141 Or App at 198 (noting a factor relevant to voluntariness includes "whether the person who gives consent is the subject of an investigation").

Second, although defendant twice communicated to Sites that a search was violating his rights and that Sites could only search him if he arrested him, Sites persisted in seeking defendant's consent.

Third, Sites's response—"if that's how you want to do it"—after defendant told him that he could search him if he arrested him, communicated to defendant that, if he did not consent to the search, he was likely to be arrested. *See State v. Guzman*, 164 Or App 90, 99-103, 990 P2d 370, 376 (1999), *rev den*, 331 Or 191 (2000) (concluding that "[a]ny consent was coerced by the possibility that [the] defendant would be arrested for a violation of his probation if he did not cooperate," although the probation officer did not have reasonable grounds to believe that the defendant was in violation of his probation). We acknowledge that a threat to do something that an officer has a legal right to do does not necessarily create a coercive atmosphere such to render subsequent consent to a search involuntary. *See State v. Williamson*, 307 Or 621, 627, 772 P2d 404 (1989) (Carson, J., concurring) ("If the officers threaten only to do what the law permits them to do, the coercion that the threat may produce is not constitutionally objectionable." (Internal quotation marks omitted.)). We also acknowledge that defendant appeared to make light of any possible arrest when he joked that, if Sites did arrest him, he wanted to take his TV with him, which the state argues shows that defendant was not concerned that he would actually be arrested. However, even assuming Sites had a lawful basis to arrest defendant,

an issue which the parties do not address and we do not decide, and considering defendant's playful response, those factors do not mitigate the implication of Sites's statement that defendant could be arrested if he did not consent to the search when that statement is viewed in the context of the particularly coercive atmosphere of the entire interaction.

Fourth, like he did during the initial search, Sites physically dominated defendant's space before obtaining his verbal assent, "Do it, do it." Sites positioned himself to search before obtaining consent by moving directly behind defendant and standing in his "immediate proximity." Sites's physical location was close enough to defendant that, as Sites testified, he did not have to reposition himself to reach into defendant's pockets after obtaining his verbal assent. That conduct was particularly intimidating when considering that Sites stood in that position for about five seconds before defendant's verbal assent, that Sites initiated the first search under similarly coercive circumstances, and that they were standing alone in a parking lot at 1:30 in the morning. In other words, Sites's physical positioning communicated that defendant did not have a real choice not to consent to the search. Rather, Sites's conduct, when viewed in the context of the entire interaction, conveyed Sites's intent to begin the search regardless of defendant's actual consent. *Cf. Freund*, 102 Or App at 652 ("[T]he officer's statement told [the] defendant that she had no choice whether a search would occur; her only option was whether the search and seizure was to be 'calm and efficient.' Defendant merely chose the option favoring calmness and efficiency.").

Defendant's words and conduct also communicated that he did not actually intend to consent to the search. *See Blair*, 361 Or at 537 ("[O]ur decisions under Article I, section 9, indicate that circumstances showing the defendant's actual understanding and intent are relevant to the voluntariness analysis."). As already noted, defendant tried to limit Sites's first request to search by searching his own pockets, told Sites that he could search him if he arrested him, twice told Sites that searching him was violating his rights, and repeatedly expressed his frustration with Sites's requests for consent to search. Defendant's occasional attempts to make light of and potentially diffuse

the situation do not persuade us that his submission to the search reflected an intent to voluntarily relinquish his constitutional rights when viewed in context of the increasingly coercive nature of the interaction and defendant's repeated expressions of frustration with it.

Although Sites testified that, after he removed his glove before beginning the second search, he understood defendant to be giving nonverbal consent when defendant held his "arms out" to his side, defendant's conduct at that point was not sufficient to communicate voluntary consent. Although potentially ambiguous, defendant's conduct of holding his arms out to his side, lifting his arms up, and then bringing them down, viewed in the context of the overall coercive nature of Sites's conduct, does not satisfy the state's burden to prove more than passive acquiescence. *Martin*, 222 Or App at 144 (concluding that, although the defendant opening her front door and running away while leaving the door open may have sent an ambiguous message as to whether she voluntarily consented to the officers walking inside her home, the state failed to meet its burden to show her conduct was anything more than acquiescence).

The state argues that *Ry/Guinto*, where we concluded that the officer's conduct was not so coercive as to render the consent of one of the two defendants involuntary, is instructive. In that case, both defendants had argued that the single defendant's consent was not the product of free will considering the officer's "persistence" in seeking consent to search despite the defendant's "repeated refusals." 211 Or App at 302-03. We first concluded that, contrary to the defendants' assertions, neither defendant had "explicitly refused to consent" in response to the officer's requests to search. *Id.* at 304. We next looked at the officer's choice of words when requesting consent, and concluded that the one directive—that the officer would "like [the defendant] to step out if [he] would please and let [him] search [his] vehicle for a weapon"—was not problematic viewed in the context of the requests to search that preceded and followed that directive. *Id.* at 306-07. We ultimately concluded that the officer's "dogged persistence in trying to obtain consent" was not so coercive as to render the defendant's consent involuntary when considering the totality of the circumstances,

including that the defendant consented to the search of the car while sitting unrestrained in the car for less than five minutes; the stop was "lawful, albeit somewhat stressful"; the encounter was on a public highway during daylight hours; and the interaction was polite and did not include weapons drawn or any threats or promises. *Id.* at 307-09.

The state argues that the circumstances here are less coercive than in *Ry/Guinto*. We disagree. Unlike in that case, defendant here explicitly and implicitly refused Sites's persistent requests to search when defendant began searching his own pockets in response to Sites's early request to search, when he twice stated that the search was violating his rights, and when he responded, "no, you can arrest me" if Sites wanted to search him. Also dissimilar to *Ry/Guinto*, Sites elicited defendant's first verbal assent while standing over him, positioned to search with his hands on defendant's poncho, and he similarly elicited defendant's second verbal assent after he had positioned himself to search by standing over and behind defendant in his "immediate proximity." That conduct, in addition to the encounter having taken place at 1:30 a.m. in a parking lot, Sites having confronted defendant with committing two crimes and implying that he could be arrested if he did not consent to the search, and Sites's persistence in seeking consent, created a more coercive atmosphere than the one at issue in *Ry/Guinto*.

In sum, considering the totality of circumstances, the state failed to meet its burden to show that defendant's consent was voluntary. Even though Sites's verbal requests for consent to search appeared to invite a response, his conduct, viewed in the context of the entire exchange, created an atmosphere coercive enough to render defendant's assent to be mere acquiescence. Therefore, the trial court erred in denying defendant's motion, and the methamphetamine evidence should have been suppressed.

We turn to defendant's argument that the criminal citation should also have been suppressed. "[T]he right to be free from unreasonable searches and seizures under Article I, section 9, also encompasses the right to be free from the use of evidence obtained in violation of that state constitutional provision." *State v. Hall*, 339 Or 7, 24, 115 P3d

908 (2005), *overruled in part on other grounds by State v. Unger*, 356 Or 59, 333 P3d 1009 (2014). The exclusionary rule requires the suppression of both the primary evidence discovered from illegal police conduct and also the secondary evidence subsequently derived from that prior police illegality. *State v. Cardell*, 180 Or App 104, 112, 116, 41 P3d 1111 (2002). "[I]n deciding the applicability of the Oregon exclusionary rule, the critical inquiry is whether the state obtained the evidence sought to be suppressed as a result of a violation of the defendant's rights under Article I, section 9." *Hall*, 339 Or at 24.

Evidence obtained in violation of a defendant's Article I, section 9, rights "is presumed [to be] tainted by the violation and must be suppressed." *State v. Jones*, 275 Or App 771, 778, 365 P3d 679 (2015) (internal quotation marks omitted). "However, the state may rebut that presumption by proving attenuation—that is, that the violation of [the] defendant's rights had such a tenuous factual link to the disputed evidence that the unlawful police conduct cannot be properly viewed as the source of that evidence." *Id.* (internal quotation marks omitted). In determining whether the state proved attenuation under the totality of the circumstances, we consider the temporal proximity between the unlawful police misconduct and the discovery of the evidence, the existence of any intervening or mitigating circumstances, and the nature, purpose, and flagrancy of the misconduct. *Unger*, 356 Or at 88; *see also Jones*, 275 Or App at 775 ("We explained that, in determining whether the state had met its burden to demonstrate attenuation under Article I, section 9, we should apply the attenuation test set forth in *Unger*."). The focus of that inquiry is on whether the evidence "was tainted because it was derived from or was a product of the unlawful conduct," or "whether police exploited or took advantage of or traded on their unlawful conduct" in obtaining the challenged evidence. *Unger*, 356 Or at 80 (internal quotation marks omitted).

Defendant argues that, because the discovery of methamphetamine directly resulted from the unlawful search and must be suppressed, the citation that was issued due to the discovery of the methamphetamine must also

be suppressed as the "direct and unattenuated product of the illegality." Defendant notes that "the citation expressed Sites's observation that defendant possessed methamphetamine, which was an observation that must be suppressed."

The state contends that, because defendant failed to appear on the citation, "under such circumstances [it] is not the 'product' of a search and it does not constitute derivative evidence that is subject to suppression." We understand the state's argument to be that defendant's conduct of failing to appear on the criminal citation attenuated the taint of the unlawful search. We agree with the state.

In *State v. Suppah*, the Supreme Court "considered whether a defendant's decision to commit a new crime after being unlawfully seized will attenuate the taint of the seizure." 358 Or 565, 577, 369 P3d 1108 (2016). In that case, the defendant was stopped in July for a traffic infraction and gave the officer a fake name, date of birth, and address, which turned out to be associated with a person whose driver's license was suspended. The defendant was subsequently cited for driving while suspended. *Id.* at 567. One month later, in August, the defendant called the district attorney's office to report that he had given the officer a fake name in July and that he was in fact the person who was driving the vehicle that was stopped. *Id.* at 568. As a result, the state charged the defendant with, along with another offense, giving false information to a police officer (FIPO). *Id.*

Before trial, the defendant argued that the stop was unlawful and moved to suppress both his July and August statements as products of the unlawful seizure. *Id.* Although the trial court agreed with the defendant that the stop was unlawful, the trial court concluded that neither his July nor August statements were the products of the unlawful seizure. *Id.* at 568-69. We reversed the trial court, holding that, although the defendant's August statements were sufficiently attenuated from the unlawful stop and admissible, his July statements should have been suppressed. We concluded that, despite the defendant's misrepresentation to the officer, the state had failed to establish that the July statements were attenuated from the unlawful stop. *Id.* at 570.

Reviewing our ruling related to the defendant's July statements,[3] the Supreme Court reversed. The court first explained that it "has long recognized that 'but for' causation is insufficient, standing alone, to establish that subsequently obtained evidence is the product of an illegality." *Id.* at 578. The court continued, stating that "in determining whether evidence is the product of an illegal seizure, the court has considered the temporal proximity between the police conduct and the discovery of the evidence, the existence of intervening circumstances, and the presence of other circumstances—such as admonitions of constitutional rights—that bear on attenuation," the "'nature, extent, and severity of the constitutional violation,'" and the "'purpose and flagrancy of the misconduct.'" *Id.* (citing *Unger*, 356 Or at 77, 86). The court went on to evaluate how a defendant's "voluntary decision" to commit a crime following unlawful police conduct, such as by, for example, resisting arrest, factors into the attenuation analysis. The court stated:

> "Typically, what attenuates the act of resisting arrest (or other criminal conduct) from the unlawful seizure that preceded it is the defendant's decision to engage in an act that goes beyond the consequences that ordinarily flow from the illegality. *See* [*State v.*] *Crandall*, 340 Or [645, 652-53, 136 P3d 30 (2006)] (defendant's act of hiding drugs under parked car after officers unlawfully had directed him to come over and talk to them attenuated taint of unlawful stop); *State v. Kennedy*, 290 Or 493, 624 P2d 99 (1981) (defendant's unsolicited invitation to search his luggage after officers unlawfully had stopped him attenuated taint of unlawful stop)."

*Id.* at 578-79. Thus, the court explained, "the commission of a new crime in response to an illegality forms a relatively *sui generis* class of attenuating circumstances." *Id.* at 579. The court ultimately held that the defendant's choice to misrepresent himself in response to the deputy's question was a circumstance that sufficiently attenuated the taint of the unlawful seizure. *Id.* at 579-80. The defendant's response, the court explained, "went beyond what ordinarily would

---

[3] The defendant did not seek review of our decision holding his August statements were attenuated from the unlawful seizure.

occur in much the same way that a defendant's decisions to resist arrest or to offer a bribe go beyond the consequences that ordinarily flow from an arrest." *Id.* at 579. Further, in "giving the deputy a false name and address in violation of [the FIPO statute], defendant knowingly chose to do something other than what the deputy had asked." *Id.* The court also noted that the unlawful seizure was not intrusive, extended, or severe. *Id.* at 579-80.

For the same reasons expressed by the Supreme Court in *Suppah*, we conclude that defendant's decision here to fail to appear on his court date was a circumstance that sufficiently attenuated the taint of the unlawful search. It is undisputed that, after Sites located methamphetamine in defendant's pants pocket, Sites issued defendant a citation instructing him to appear in court on that criminal charge and that defendant did not show up to that court date. Defendant's voluntary decision to fail to appear to court as instructed in the criminal citation, a violation of ORS 133.076,[4] was a circumstance that created a tenuous factual link between the unlawful search and the issuance of the citation sufficient to attenuate the taint of Sites's unlawful search. When a person is cited by an officer to appear in court, the expectation is that the person will choose to appear or face subsequent consequences, such as the court issuing a warrant for the person's arrest. In choosing to not appear at the court date contained in the citation, defendant's actions went "beyond the consequences that ordinarily flow from the illegality." *Suppah*, 358 Or at 578.

---

[4] In relevant part, ORS 133.076(1) provides:

"A person commits the offense of failure to appear on a criminal citation if the person has been served with a criminal citation issued under ORS 133.055 to 133.076 and the person knowingly fails to do any of the following:

"(a) Make an appearance in the manner required by ORS 133.060."

ORS 133.060 provides:

"(1) A person who has been served with a criminal citation shall appear before a magistrate of the county in which the person was cited at the time, date and court specified in the citation, which shall not be later than 30 days after the date the citation was issued.

"(2) If the cited person fails to appear at the time, date and court specified in the criminal citation, and a complaint or information is filed, the magistrate shall issue a warrant of arrest, upon application for its issuance, upon the person's failure to appear."

Additionally, the tenuous factual link between the citation and the unlawful search is further supported when considering the nature of the police conduct and the temporal proximity between the unlawful search and production of the citation. That is so because it was defendant's conduct of failing to appear that transformed the citation, a document that simply initiated the criminal process at the time it was issued, into evidence of a crime. *See* ORS 133.055(1) (allowing a "peace officer" to deliver "a criminal citation to a person if the peace officer has probable cause to believe that the person has committed a misdemeanor or has committed any felony that is subject to misdemeanor treatment under ORS 161.705," and that the "criminal citation shall require the person to appear" in court); *Unger*, 356 Or at 88-92 (question for purposes of attenuation is whether the officers exploited their unlawful conduct to obtain the evidence). As *Suppah* explained, a defendant's choice to commit a crime following unlawful police conduct is a relatively unique class of attenuating circumstances. 385 Or at 579. And, absent some factual circumstance indicating otherwise, a defendant's decision to commit a new crime following the unlawful police conduct will, in many cases, transform the nature of the causal connection between the unlawful police conduct and the disputed evidence such that it cannot be properly viewed as a product of the unlawful conduct. Considering the totality of the circumstances, defendant's decision to fail to appear is such a circumstance here. Therefore, although defendant is entitled to the suppression of the methamphetamine evidence, he is not entitled to the suppression of the criminal citation as a result of the unlawful search.

Conviction on Count 1 reversed and remanded; remanded for resentencing; otherwise affirmed.