670 June 17, 2026 No. 556

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

VIDAL GONZALEZ TETLCTLE,
*Defendant-Appellant.*

Linn County Circuit Court
21CR55897; A182130

Brendan J. Kane, Judge.

Argued and submitted August 20, 2025.

Joshua B. Crowther, Chief Deputy Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Greg Rios, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Joyce, Judge, and Hellman, Judge.

HELLMAN, J.

Affirmed.

**HELLMAN, J.**

Defendant appeals a judgment of conviction, entered after a conditional plea, for unlawful possession of a marijuana item, ORS 475B.337(3)(c). In three assignments of error, defendant challenges the trial court's denial of his motion to suppress and renewed motion to suppress. First, defendant contends that the state did not establish that defendant consented to the warrantless search of the U-Haul truck that he and his codefendant were driving. Both defendant's and codefendant's primary language is Spanish, and an officer used a translation application on his phone to communicate with the men during the stop. In defendant's view, because the officer failed to save a transcription of the input and translated output from that application, the state failed to create a sufficient record to establish that defendant voluntarily consented to the search. We conclude that the evidence in the record is legally sufficient to support the trial court's conclusion that defendant and codefendant understood the officer's request for consent to search and voluntarily consented.

Second, defendant argues that the officers lacked reasonable suspicion to extend the traffic stop to investigate whether defendant possessed an unlawful quantity of marijuana. We conclude that the trial court relied on specific and articulable facts that are supported by the record to determine that reasonable suspicion of unlawful possession of marijuana justified the investigation. Third, defendant contends that the state failed to meet its burden to prove that he validly waived his *Miranda* rights, arguing that the evidence before the trial court did not establish whether the translation application on the officer's phone accurately translated the *Miranda* warnings into Spanish and whether that translation adequately conveyed the concepts contained in the warnings. We reject that argument as unpreserved. We therefore affirm.[1]

---

[1] We affirmed codefendant's conviction for unlawful possession of a marijuana item in *State v. Alatorre*, 341 Or App 470 (2025) (nonprecedential memorandum opinion). The cases against both men were consolidated before the trial court. On appeal, the defendant in *Alatorre* challenged the denial of his motion to suppress on bases similar to those raised in the instant case, specifically that the state failed to establish that codefendant had consented to the search and that officers lacked reasonable suspicion to investigate whether he possessed an

## I.   FACTS

"We review a trial court's denial of a motion to suppress for legal error, and we are bound by the trial court's factual findings if there is any constitutionally sufficient evidence in the record to support them." *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017). When the trial court did not make express findings and there is evidence from which the trial court could have found a fact in more than one way, we will presume that the trial court decided the facts consistently with the trial court's ultimate conclusion. *Id.* We take the facts from the record of the suppression hearing, viewed consistently with those standards.

While off duty and driving south on Interstate 5, Deputy Newman began to smell an odor of marijuana that he believed was emanating from a 26-foot U-Haul truck. In his experience, the odor was stronger than the smell he had sensed when interacting with individuals possessing a "user's amount" of marijuana in the past. Newman called State Trooper King, who was patrolling the area, to share his concerns. King then stopped the truck for traveling five miles per hour over the speed limit. As King approached the U-Haul, he "was struck by the large odor" of "green marijuana that was coming from [the back right corner] of the vehicle." King testified that "the larger quantity you get * * * the more prevalent the odor becomes," but explained that "just on odor alone, * * * it's very difficult to get an idea on what kind of quantity you're dealing with."

King asked defendant and codefendant for identification and the rental agreement for the U-Haul. Although King noted "an English language barrier," he "was confident" that defendant and codefendant "understood enough" of "the basic stuff [he] was asking" because he "was getting * * * a response from them in broken English." Defendant and codefendant provided King with Mexican identification cards as well as the rental agreement, which named a third party as the renter and referenced Eureka, California

---

unlawful quantity of marijuana. *Id.* at 471-73. Defendant in this case also raises a third assignment of error, challenging the validity of his waiver of *Miranda* rights, and we further note that the briefing in the instant case presents a more developed argument regarding the issue of consent. We thus take the opportunity to explain our decision in a precedential opinion.

as the destination. When King asked where they were going, the men explained that they were "taking sofas to Grandpa." King was then called away on a separate police matter and turned the investigation over to Detective Nelson and Newman, who had by that point arrived on the scene. King relayed the information he had gathered thus far and explained that the individuals were "non-English speaking." Newman reviewed the rental agreement when he arrived, which raised his concern because rental cars and U-Hauls are commonly used to transport drugs across state lines.

As Nelson approached the vehicle, he detected "a very overwhelming odor of fresh marijuana," which, based on his training and experience, "appeared to be stronger than individuals carrying marijuana for personal consumption." Newman similarly described "an overwhelming odor of marijuana coming from the U-Haul."

Newman made contact with defendant and codefendant and came to the interaction "prepared to use a translation application on [his] phone" called "iTranslate." He either spoke or typed into the phone, the application transcribed and translated the information, and then Newman would show defendant and codefendant his screen. To allow the men to respond, Newman "would press on the Mexican flag" and then defendant and codefendant "could speak and then it would come back to [Newman]."

Using the application, Newman typed *Miranda* warnings into the phone and, after showing the application's translation of the warnings to the men, asked the men whether he could look in the back of the vehicle. He did not "recall them saying no" and Newman testified that "they had said something to the effect of they were just carrying furniture, and that it was locked and they didn't have keys." Newman indicated that, absent their consent, he would apply for a search warrant. When the men again explained that they could not get into the back of the truck, Newman asked if he could physically break the lock, and defendant and codefendant agreed that he could. The exchange was captured in body camera footage:[2]

_____
[2] The following is based on our transcription of the audio from Nelson's body camera video. Newman's phone was used throughout this interaction to facilitate

"[NELSON]:   No English at all? Poquito English? Mas menos? It can't hear—the phone can't hear.

"[NEWMAN]:   Can you open the door? Not this one. That might be better (inaudible).

"[Newman holds the phone up; the men speak towards the phone in Spanish.]

"[NEWMAN]:   (inaudible). Slow down. Okay?

"[Newman holds the phone up; the men speak towards the phone in Spanish.]

"[NEWMAN]:   There are no keys?

"[UNIDENTIFIED MALE]:   No.

"[NEWMAN]:   If we can't get in (inaudible) then we'll have to seize the truck and write a search warrant to (inaudible).

"[Newman holds the phone up so the men can see the screen.]

"[UNIDENTIFIED MALE]:   Ok.

"[NEWMAN]:   If the search warrant is signed, then we'll be able to open up the truck and kinda look inside. (inaudible)

"[Newman holds the phone up so the men can see the screen.]

"[NEWMAN]:   But if we can get inside now and you'll consent to it, (inaudible).

"[Newman holds the phone up so the men can see the screen.]

"[NEWMAN]:   I can have you guys on your way (inaudible).

"[Newman holds the phone up so the men can see the screen.]

"[NEWMAN]:   Ok, so you can't get in? (inaudible).

---

the exchange, which we have noted in brackets throughout the transcription, although we note that the phone screen is not visible in the video. Additionally, because of the quality of the body camera footage, due to the rainy weather, loud highway noise, and Nelson's location behind Newman, it is sometimes difficult to see where the phone is or how it is being used.

"[The men respond in Spanish.]

"[NEWMAN]: So are you saying we cannot get into the back of the truck? So are you saying we cannot get into the back of the truck?

"[Newman holds the phone up so the men can see the screen.]

"(inaudible)

"[NEWMAN]: Can you open it?

"[UNIDENTIFIED MALE]: (inaudible)

"[NEWMAN]: It won't open?

"[NELSON]: If we can open it, will they consent to that?

"[NEWMAN]: If I—if I open it, is that okay?

"[UNIDENTIFIED MALE]: Oh no, it might break the lock.

"(inaudible)

"[NEWMAN]: No?

"[UNIDENTIFIED MALE]: No—no. [The speak men in Spanish into the phone.]

"(Trooper speaking on radio)

"[Newman holds the phone up so the men can see the screen.]

"[NEWMAN]: So, can I cut the lock?

"[Newman holds the phone up so the men can see the screen.]

"[NEWMAN]: I can cut the lock?

"[UNIDENTIFIED MALE]: Yeah.

"[NEWMAN]: You'll let me break it?

"[UNIDENTIFIED MALE]: Si.

"[NEWMAN]: Wait right here, okay?"

Newman testified that the men "appear[ed]" to understand what they were reading on the translation application, and that, several times during the stop, Newman

asked if the men understood by saying, "comprende," to which they responded by "[n]odding their head in the affirmative, or saying, 'si' or 'yes.'" Newman had used iTranslate previously but did not know "how well the application translated" the input. He did not save any screenshots or information from the application.

After breaking the lock and entering the back of the truck, Newman observed multiple garbage bags and plastic tote boxes, which he believed contained marijuana, and at that point, he applied for a warrant to conduct a further search, which was granted.

Defendant moved to suppress the evidence that the police found during the traffic stop under Article I, section 9, of the Oregon Constitution.[3] In his written motion and at the hearing, defendant argued that the state failed to carry its burden to prove that he had consented to the warrantless search of the truck because the officer had used "a purported translation application [of] which we have no record of what appeared on the screen for the occupants to read." Second, he argued that Newman unlawfully extended the traffic stop because odor alone does not give rise to a reasonable suspicion that defendant was in possession of an unlawful amount of marijuana. The state responded that the officers had obtained valid consent to search on the basis that the body camera footage showed the officers speaking into the phone and showing the translated text to defendant and codefendant, and in that video, the driver can be heard giving Newman consent to cut the lock. Second, the state argued that, based on the totality of the circumstances, Newman had reasonable suspicion to investigate whether defendant was transporting an unlawful quantity of marijuana.

After a hearing on the motion, the trial court ruled that the officers had obtained valid consent to search the truck:

"[T]he issue that I want to address first is about consent. *** Trooper King contacts the Defendants, and even though Trooper King *** testified that he doesn't speak

___

[3] Article I, section 9, provides, in relevant part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

any Spanish, he is somehow able to procure identification, driver's license, U-Haul rental agreement, and finds out from the Defendants that they're transporting sofas to Grandfather. Pretty amazing despite the fact that he didn't have an iTranslate or the services of a court certified interpreter with a BA in Spanish, or any other such accouterments at his disposal.

"* * * * *

"As far as the consent was concerned, Senior Trooper King, as I indicated earlier, was somehow able to communicate on a nominal level without speaking any Spanish. And this application that then Detective Newman provided, yes, the burden is on the State, but it's by a preponderance of the evidence that they understand that they—what the Miranda warnings are. The statements that were being made wasn't the issues being suppressed, it's the extension of the stop and the reasonable suspicion is what was articulated at the beginning, and that's already been addressed and identified."

The trial court also ruled that the expansion of the traffic stop was justified by reasonable suspicion based on the "overwhelming odor of marijuana coming from the back of the U-Haul," the fact that "[t]he person who rented the *** U-Haul wasn't even in the vehicle," and that "[it] was a one[-]way rental." The court also noted that "moving sofas for grandpa and nobody had a key to the back, that's going to be hard to give grandpa his sofas back when nobody has a key to the U-Haul." For those reasons, the trial court denied defendant's motion to suppress.

Defendant later renewed his motion after we issued a decision in *State v. Vannoy*, 326 Or App 11, 17, 530 P3d 503 (2023), in which we accepted the state's concession that an officer lacked reasonable suspicion to investigate the defendant for a marijuana crime "based only on the odor of marijuana." *Id.* The trial court again denied the motion and distinguished defendant's case from *Vannoy*, noting that "some of the facts that differentiate" defendant's case included that the officers had detected an "overwhelming odor of marijuana" that was "stronger in the cargo section of the truck and not in the passenger section of the vehicle." Defendant subsequently entered a conditional plea of no contest and

reserved his right to appeal the trial court's rulings on his motion to suppress and renewed motion to suppress.

## II.   ANALYSIS

### A.   *Consent to Search*

On appeal, defendant first argues that where the state relies on a defendant's verbal consent to validate a warrantless search, "the state must create an accurate record of what the officers said and did and what defendant actually understood before a reviewing court can constitutionally assess whether a person waived their Article I, section 9, rights." In his view, because Newman failed to save any information from the translation application, the record is insufficient to prove that defendant actually consented. Alternatively, defendant contends that even if defendant understood some of the exchange, the totality of the circumstances establish that defendant merely acquiesced to police authority, which does not constitute valid consent. As we explain, we conclude that the evidence in the record was legally sufficient to establish that defendant voluntarily consented to the search. We further determine that defendant did not preserve his argument that he merely acquiesced to police authority, and the record does not establish that the trial court plainly erred in denying the motion to suppress on that basis.

Under Article I, section 9, "[w]arrantless entries and searches of premises are *per se* unreasonable unless they fall within one of the few specifically established and carefully delineated exceptions to the warrant requirement." *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988). Consent to search is one such exception to the warrant requirement "because consent relinquishes a person's privacy interest in property so that there is no unlawful intrusion." *State v. Bonilla*, 358 Or 475, 480, 366 P3d 331 (2015). When the state relies on consent to justify a warrantless search, "the state has the burden to prove by a preponderance of the evidence that someone having the authority to do so voluntarily gave the police consent to search the defendant's person or property." *State v. Jordan*, 308 Or App 547, 552, 481 P3d 1017 (2021) (internal quotation marks omitted).

"The proper focus in determining the voluntariness of consent under Article I, section 9, is the defendant's actual understanding and intent." *State v. McCray*, 304 Or App 279, 282, 466 P3d 1042 (2020). For us to determine whether the alleged consent was "actually" given, "the state must establish with some precision how the law enforcement officers ma[d]e a request of a defendant." *State v. Sunderman*, 304 Or App 329, 337, 467 P3d 52 (2020) (internal quotation marks and brackets omitted); *see also State v. Warner*, 284 Or 147, 161, 585 P2d 681 (1978) ("[A]ppellate courts must know what the state's witnesses contend was actually said, in order for appellate courts to discharge their constitutional function in determining the validity of consent."). Although "conclusory testimony regarding a claim of consent creates a problem for appellate courts," an officer's "failure to testify to the actual words used to convey a request for consent to search and the words used in response to that request does not necessarily mean that the state has failed to meet its burden." *State v. Miller*, 375 Or 173, 197, 200, 589 P3d 151 (2026) (internal quotation marks omitted). In other words, conclusory evidence that an officer asked for consent that the defendant provided is insufficient to prove that the consent was given voluntarily; however, the state is not required to put forth a complete transcription of the entire interaction between law enforcement and a defendant to carry its burden.

Here, we conclude that the record is legally sufficient to establish that defendant understood that Newman was requesting consent to enter the back of the U-Haul and that he consented to that search. In determining that defendant and codefendant consented to the search, the trial court found that King "was somehow able to communicate on a nominal level without speaking any Spanish" and that the men were responsive to King's questions. Moreover, even though the record does not contain evidence as to the exact information the officer put into the translation application, nor the output in Spanish, the body camera video provides some details about the officer's conversations with defendant and codefendant. Specifically, when Newman asked, with the aid of the translation application, whether he could enter the back of the truck, defendant and codefendant responded, in Spanish, that they did not have keys to open the back, and

Newman orally confirmed his understanding of their statement that was translated by the application. That exchange suggests that the men comprehended the nature of the officer's request and vice versa, that the officer understood the men's response to his questions. The footage also shows that, in response to the men explaining that they did not have keys to the back of the truck, Newman asked whether he could cut the lock, and defendant and codefendant responded in the affirmative, in both English and Spanish.

Although we affirm the trial court's denial of defendant's motion to suppress, we have concerns about the lack of a documented translation of the conversation between the officers, defendant, and codefendant. The record establishes that a language barrier hindered the exchange on the critical issue of whether defendant consented to the search. Specifically, the body camera video shows that both the officers as well as defendant and codefendant had to repeat their statements multiple times to ensure the other party understood their questions and answers. We are also concerned that the record is so sparse on the translation application that was used and caution that in another case the failure to develop the record on the application in general and the specific exchange may very well result in suppression of evidence.

That said, having carefully reviewed the record in this case, including the bodycam footage, we conclude that the trial court's findings regarding the men's comprehension are supported by the record. Specifically, in the bodycam footage, Newman can be seen speaking directly into the application, he can be heard confirming his understanding of the men's statements that they did not have keys to the vehicle, and throughout the exchange, the men were responsive to the officers' questions in that they were able to produce the requested documents and explain why they could not access the back of the vehicle. That record is legally sufficient to support a conclusion that defendant and codefendant consented to the search.

As to defendant's alternative argument that he merely acquiesced to police authority and thus did not voluntarily consent, we determine that defendant did not preserve

that argument. The state does not dispute preservation; however, "we have an independent obligation to determine whether an argument advanced on appeal was preserved at trial." *State v. Brunkal*, 324 Or App 306, 309, 525 P3d 500, *rev den*, 371 Or 284 (2023) (internal quotation marks omitted). Below, in his written motion to suppress as well as at the hearing on that motion, defendant framed the question as whether defendant and codefendant "understood the consent that was being requested when they gave it" in light of the language barrier and whether the court could assess that question without evidence from the translation application. Defendant did not raise or develop any argument regarding acquiescence to the trial court in his original or renewed motion to suppress. Analyzing whether a defendant acquiesced to authority is a highly fact-specific inquiry. In conducting that review, a court is required to examine the exact words used by an officer to request consent to determine whether the words provided "the listener with a reasonable opportunity to choose to consent, or [whether] those words [left] the listener with the impression that a search is inevitable[.]" *State v. H. K. D. S. (A163158)*, 305 Or App 86, 92, 469 P3d 770 (2020) (internal quotation marks omitted); *see also, e.g.*, *State v. Briggs*, 257 Or App 738, 742-43, 307 P3d 564, *rev den*, 354 Or 386 (2013) ("We will, however, pay close attention to the words used by an officer who requests consent to perform a warrantless search. When those words do not provide the listener with a reasonable opportunity to choose to consent, or when those words leave the listener with the impression that a search is inevitable, absent strong countervailing factors, we have consistently found acquiescence rather than consent."); *State v. Ry/Guinto*, 211 Or App 298, 306 n 5, 154 P3d 724, *rev den*, 343 Or 224 (2007) ("[I]n the absence of compelling circumstances to the contrary, an officer's particular choice of language is highly significant in assessing whether a reasonable person would understand the officer's remarks to be so coercive as to render refusal to consent futile.").

Determining whether an officer's choice of words to request consent was coercive is a separate and distinct inquiry from determining whether the defendant understood the actual words used by the officer. *See, e.g.*, *Miller*,

375 Or at 200-01 (noting, in the context of Article I, section 9, that "[the] defendant does not contend that [the officer] improperly coerced her into agreeing to have her blood drawn to check her BAC or that she merely acquiesced to [the officer's] demand" and "[i]nstead, she contends that, because of her intoxication and physical condition, she could not understand what she was being asked to do"). Although both analyses examine the exchange between the officer and defendant, they do so for entirely different purposes. We have previously determined that "the presence of a common thread" between an argument made before the trial court and an argument on appeal "does not satisfy the preservation requirement if the two arguments are qualitatively different." *State v. Gray*, 286 Or App 799, 806, 401 P3d 1241 (2017), *rev den*, 362 Or 482 (2018) (internal quotation marks omitted). Such is the case here. Defendant's argument below focused exclusively on the sufficiency of the record to evaluate whether defendant understood the officers' request in light of the language barrier. Thus, as to acquiescence, defendant failed to "provide the trial court with an explanation of his *** [contention] that [was] specific enough to ensure that the court [could] identify its alleged error with enough clarity to permit it to consider and correct the error immediately." *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). Moreover, because the trial court's factual findings on the issue of comprehension formed the basis of its denial of defendant's motion to suppress, the trial court would likely be surprised to find itself reversed on the issue of acquiescence, which was neither presented nor considered. *See State v. Skotland*, 372 Or 319, 329, 549 P3d 534 (2024) ("Sometimes, the winds of preservation can be gauged by looking to the weathervane of trial court surprise: Would the trial court be taken aback to find itself reversed on this issue, for this reason? Here, the answer is yes." (Emphasis omitted.)).

Defendant has not requested that we review the error as plain, and we ordinarily do not conduct such review absent a request. *See State v. Ardizzone*, 270 Or App 666, 673, 349 P3d 597, *rev den*, 358 Or 145 (2015) ("[W]e ordinarily will not proceed to the question of plain error unless an appellant has explicitly asked us to do so because it

is incumbent upon the appellant to explain to us why an error satisfies the requisites of plain error and, further, why we should exercise our discretion to correct that error." (Internal quotation marks omitted.)). Even so, we would not find any error to be plain on this record. At oral argument, in support of defendant's argument that he had acquiesced to police authority, appellate counsel asserted that officers repeatedly asked defendant whether they could enter the truck, and that defendant repeatedly denied that request. However, we note that the officer appeared to repeatedly ask questions about entering the back of the truck to ensure the translation application was working properly and to allow the men to respond. Under those circumstances, it is not obvious nor beyond reasonable dispute that the officer's persistence was intended to, or would have, coerced defendant, but rather, was a product of the language barrier and an attempt to communicate his request in light of that. *See State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013) ("For an error to be plain error, it must be an error of law, obvious and not reasonably in dispute, and apparent on the record without requiring the court to choose among competing inferences."). We therefore reject defendant's argument that the trial court erred in denying his motion to suppress on the basis that his consent was involuntary.

B.  *Reasonable Suspicion*

Second, defendant argues that the trial court erred in denying his motion because police unlawfully extended the traffic stop without reasonable suspicion of another crime. Specifically, defendant contends that, under *State v. Moore*, 311 Or App 13, 18, 488 P3d 816 (2021), the officers impermissibly relied on odor to extend the traffic stop and launch a criminal investigation. He further argues that the totality of the circumstances here does not give rise to to reasonable suspicion. We disagree with defendant's argument.

For purposes of Article I, section 9, "all investigative activities, including investigative inquiries, conducted during a traffic stop are part of an ongoing seizure and are subject to both subject-matter and durational limitations." *State v. Arreola-Bottello*, 365 Or 695, 712, 451 P3d 939 (2019). For that reason, "an officer is limited to investigatory

inquiries that are reasonably related to the purpose of the traffic stop or that have an independent constitutional justification." *Id*. Accordingly, to be lawful, "an extension of a traffic stop to conduct a criminal investigation must be justified by reasonable suspicion of criminal activity." *Moore*, 311 Or App at 18 (internal quotation marks omitted). The reasonable suspicion standard is satisfied when the officer "can point to specific and articulable facts that give rise to a reasonable inference that the defendant committed or was about to commit a specific crime or type of crime." *State v. Wicks*, 332 Or App 67, 69-70, 549 P3d 49 (2024) (internal quotation marks omitted). The officer must have a "subjective belief that the person stopped has committed, or is about to commit, a crime, and that belief must be objectively reasonable under the totality of the circumstances." *Moore*, 311 Or App at 18. In this case, we do not understand the parties to dispute that the officers subjectively believed that defendant possessed an unlawful amount of marijuana, and accordingly, we focus our review on whether the officers' belief was objectively reasonable under the totality of the circumstances.

We conclude that the trial court did not err when it determined that reasonable suspicion of unlawful possession of marijuana justified the investigation. Here, the trial court relied on several specific and articulable facts that are supported by the record: Newman smelled the odor of marijuana emanating from the U-Haul as he drove behind it on the freeway, all three law enforcement officers smelled the strong odor of marijuana as they approached the U-Haul on foot, and, based on their training and experience, they believed that the quantity of marijuana that would be needed to cause the smell was "significantly different than *** lawfully permissible quantities of marijuana for an individual." In addition to the testimony about the marijuana odor, the trial court found that (1) defendant and codefendant represented that "they're transporting sofas to grandfather," (2) it was "going to be hard to give grandpa his sofas back when nobody has a key to the U-Haul," (3) the person "who rented the *** U-Haul wasn't even in the vehicle," and (4) the rental was one-way. The foregoing facts are supported by the record and—when considered in

light of the totality of the circumstances known to the officers—create an objectively reasonable inference of unlawful possession of marijuana.

We are unpersuaded by defendant's argument that, under *Moore*, the officers lacked reasonable suspicion because "they could not assess [the] exact quantity of marijuana from smell alone." In *Moore*, the trooper stopped the defendant's car for speeding and smelled unburnt marijuana as he approached the passenger side of the car. *Id.* at 15. We concluded that the trooper unlawfully extended the stop because the

> "testimony relating to the 'very strong' odor of 'more than just a very small amount' of 'unburnt' marijuana—in the absence of any additional indicia that the quantity of marijuana that might have been present was unlawful— is insufficient to support an objectively reasonable suspicion that [the] defendant possessed an unlawful amount of marijuana."

*Id.* at 22. In reaching that conclusion, we explained that, as the legal status of marijuana has changed, "the smell of marijuana generally no longer has the significance it once had as a basis for reasonable suspicion" and that "odor adds only that much to the calculus." *Id.* at 19 (brackets, internal quotation marks, and emphasis omitted).

This case is distinguishable from *Moore* because, as explained above, the trial court did not rely solely on the officers' testimony that they smelled the strong odor of marijuana as they approached the U-Haul. Defendant's contention that those findings do not contribute to reasonable suspicion because "[t]here was no evidence that [defendant and codefendant] could not be driving a U-Haul" and "[i]t is not suspicious to rent a U-Haul for transporting items" is unavailing. The trial court did not find that the men had impermissibly rented the U-Haul or that they were otherwise unlawfully driving the truck. Nor did it conclude that renting a U-Haul for transportation was itself indicative of criminal conduct. Rather, the trial court relied on specific testimony that the men were not named in the rental agreement, that the truck was travelling only one way, and that, in the officer's training and experience, rental vehicles are

commonly used to transport marijuana. It further found defendant's and codefendant's stated reason for their trip implausible because it would be difficult to transport furniture to a family member when the men ultimately could not open the truck. We therefore conclude that Newman's belief that criminal activity was occurring was objectively reasonable in light of the totality of the circumstances. The trial court did not err in denying defendant's motion to suppress or renewed motion to suppress.

C.   Miranda *Waiver*

Finally, in his third assignment, defendant argues that the state did not obtain a valid waiver of defendant's rights against self-incrimination under Article I, section 12, because when *Miranda* warnings are translated into another language, the state must prove that the translation adequately conveyed the concepts described by the warnings. The state responds, and we agree, that defendant's argument is unpreserved.

At trial, Newman testified that he had typed *Miranda* warnings into the translation application and showed the translation to defendant and codefendant. In closing, defendant's counsel briefly argued that the state had failed to meet its burden to show that defendant had validly waived his *Miranda* rights:

> "And, also, I think to a certain degree, it's on—the burden is on the State to prove that these individuals knew that they were—what they were consenting to and knew that they'd been given their *Miranda* warnings, because I think there's a case out there—and I don't have the cite to it—but it says if the *Miranda* warnings are conveyed incorrectly or not fully given, then they're not *Miranda* warnings at all."

Beyond that comment, the argument was not otherwise raised at the hearing or in defendant's written motion. In its ruling, the trial court explained that it did not understand defendant to challenge validity of his waiver and declined to issue a ruling as to that issue:

> "And this [translation] application that then Detective Newman provided, yes, the burden is on the State, but it's

by a preponderance of the evidence that they understand that they—what the *Miranda* warnings are. The statements that were being made wasn't the issues being suppressed, it's the extension of the stop and the reasonable suspicion is what was articulated at the beginning, and that's already been addressed and identified."

The trial court thus did not specifically rule that defendant's *Miranda* waiver was valid, and defendant did not clarify or further argue that he was entitled to suppression of any particular statement. The state therefore did not have an opportunity to respond to that line of argument, nor did defendant's argument sufficiently alert the trial court of his contention. We therefore conclude that defendant failed to preserve his argument for our review.

Affirmed.