Argued and submitted May 29, 2019, affirmed November 24, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TIMOTHY ALLEN TATE,
*Defendant-Appellant.*

Linn County Circuit Court
16CR41297; A164912

501 P3d 1064

Defendant appeals from a judgment of conviction, entered following a bench trial, for delivery of marijuana to a minor, first-degree sexual abuse, first-degree rape, and first-degree sodomy. On appeal, defendant challenges the trial court's denial of his motion to suppress DNA evidence obtained from a buccal swab. Defendant argues that his consent to the swab was not voluntary, because a Department of Human Services (DHS) caseworker's statements made after defendant consented to the swab, but before the swab was taken, rendered his consent involuntary. In the alternative, defendant asserts that his consent was derived from the violation of his rights under Article I, section 12, of the Oregon Constitution. *Held*: The trial court did not err in denying the motion to suppress with respect to the DNA evidence, because defendant voluntarily consented to the search and that consent was not derived from a violation of defendant's constitutional rights.

Affirmed.

Carol R. Bispham, Judge.

Kali Montague, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Michael A. Casper, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Powers, Judge, and Sercombe, Senior Judge.

ORTEGA, P. J.

Affirmed.

## ORTEGA, P. J.

Defendant appeals from a judgment of conviction, entered following a bench trial, for delivery of marijuana to a minor (Count 1); first-degree sexual abuse (Count 2); first-degree rape (Count 3); and first-degree sodomy (Count 4). On appeal, defendant challenges the trial court's denial of his motion to suppress DNA evidence obtained from a buccal swab. Defendant argues that his consent to the swab was not voluntary, because a Department of Human Services (DHS) caseworker's statements made after defendant consented to the swab, but before the swab was taken, rendered his consent involuntary. In the alternative, defendant asserts that his consent was derived from the violation of his rights under Article I, section 12, of the Oregon Constitution. We conclude that the trial court did not err in denying the motion to suppress with respect to the DNA evidence, because defendant voluntarily consented to the search and that consent was not derived from a violation of defendant's constitutional rights. Accordingly, we affirm.

"In reviewing a denial of a motion to suppress, we are bound by the trial court's findings of historical facts as long as there is constitutionally sufficient evidence in the record to support those findings." *State v. Ry/Guinto*, 211 Or App 298, 300, 154 P3d 724, *rev den*, 343 Or 224 (2007). We summarize the facts consistently with that standard of review.

Defendant was accused of giving marijuana to M and sexually assaulting her in his bedroom, using force. M, who was 17 at the time, went to a hospital where she was examined for sexual assault. She reported that defendant, who is her cousin's boyfriend, had given her marijuana and raped her. The hospital collected semen and sperm from two stains on M's clothing. DNA later collected from defendant matched DNA found in those stains.

Before trial, defendant moved to suppress statements he made to the police, and the DNA collected from him, on the ground that the statements and his agreement to the DNA swab were not voluntary. At the suppression hearing, the parties presented the following evidence.

Detective Rossiter was assigned M's case. He was having difficulty locating defendant, who was likely living out of his car at the time. Six months later, after defendant's girlfriend had given birth to their shared child, a DHS case-worker, Fitzgerald, arranged a meeting with defendant at her office. Fitzgerald notified Rossiter about the meeting as she was aware that the police were trying to locate defendant. Rossiter and another police detective, Detective Miller, went to the DHS meeting so that they could talk with defendant. Fitzgerald met defendant at the front door of the office and escorted him to a meeting room where they met the two detectives.

Rossiter introduced himself and asked defendant if he would talk with the detectives. Defendant agreed to speak with Rossiter and indicated that he had an idea what it was about. Rossiter asked about defendant's relationship with M, and defendant made several statements. Rossiter then stopped defendant and obtained his permission to set up a recording of the interview. Rossiter, Miller, Fitzgerald, and defendant sat down around a conference table, and Rossiter began the recording at 9:04 a.m.

Rossiter began the interview by reciting *Miranda* warnings, which defendant said he understood and did not have any questions. Rossiter then asked defendant to repeat what he had said before the recording, which included that he did not have a relationship with M, that he had "cheated just that one time," that it was "for three to five minutes" until he said "Hey, I can't do this," that he had been smoking marijuana, but M had not, and that he thought that M was 18 years old.

Rossiter then elicited more information from defendant about the events. Defendant said that they went to his uncle's house, defendant smoked marijuana outside, they talked about his relationship with his girlfriend, then they went inside to defendant's bedroom, where "things started happening," but he told her he could not do it. Defendant also denied having intercourse with M and said that M was upset, "pretty irate," when he stopped her. Defendant also stated that a friend of M messaged him and said that M told his girlfriend that defendant had raped M, but that M never went to the hospital.

Rossiter informed defendant that M did go to the hospital, that she reported defendant had forced himself on her and ejaculated inside of her. Rossiter then asked defendant if there was any chance that defendant's DNA would be in or on M, to which defendant responded, "Not from what I know of." Rossiter asked if defendant would "submit a DNA sample for comparison" and defendant responded "sure." Rossiter then told defendant that he was going to go to his car to get the swabs and explained that he would rub them on the inside of defendant's cheek to collect the DNA. Rossiter offered to leave the recording on, but Miller told him to turn it off, because "we won't talk without you in here." Rossiter told defendant that the DHS caseworker, Fitzgerald, would have things to talk about with him, because he had a child at home and "[t]here is some concern." Rossiter also said that he had a report from another person, K, that defendant "forced [her] to do some things after smoking marijuana with you." Rossiter stopped the recording at 9:13 a.m. and left the room, closing the door behind him.

While the recording remained off, Fitzgerald explained her role and the possibility of creating a safety plan with regard to defendant's infant son. Defendant asked what would happen to his son, and she told him that there's "different avenues" to take. She explained in-home safety plans, psychosexual analyses, and that, even if he committed a crime, it did not mean defendant would never be able to parent. She also explained that adult protective services would be involved, because defendant had talked about living with his mother, who runs an adult foster care home from her house, and they needed to evaluate if it was safe for defendant to be there. Defendant was upset, teary-eyed, looking at the ground, and his voice was shaking. He said that he did not want to lose his son, that he was not a bad dad, and that he still wanted to parent. Fitzgerald responded that parenting was a possibility, but he had to be truthful so that she could make an appropriate safety plan. The exchange lasted less than 10 minutes, during which defendant remained seated. At one point, defendant had also turned to Miller and stated, "She was eighteen. It was after her birthday." Miller started to respond "[w]ell the

medical records," but then stopped and told defendant that he had to talk to Rossiter.

Rossiter returned to the room and immediately noticed that defendant's demeanor and appearance had changed:

> "When I left [defendant]—he was calm, he seemed to have normal color to his pallor. When I showed back up, he was a little bit more red-faced and looked like he may have either started to cry or had been crying just before I walked in."

He commented, "Okay, something's changed. What's up?", and he was told that they had talked while Rossiter was out. At that point, Rossiter restarted the video recording. While recording, Rossiter said:

> "I read you *Miranda* and all those things apply. It's 9:22 in the morning.

> "And before I left, you told me that you would give me consent to, you know, collect a sample of your DNA.

> "And while I was gone some things were presented to you that this report actually comes from prior to her 18th birthday. Are we talking about the same incident?"

Defendant said it was and that he had "hung out" twice with M; that the first time was before her eighteenth birthday and the second time was after her eighteenth birthday and the second time was "when things happened." Rossiter asked if there would be any reason for his DNA to be on M after their first contact, and defendant said no. Detective Miller asked again in more detail, and defendant said he and M kissed, but his tongue did not go in her mouth. Rossiter then said, "Okay. Say 'ah' please." Defendant complied and Rossiter swabbed the insides of defendant's cheeks. After obtaining the swab, Rossiter asked if, during the time the recorder was off, he made any threats or promises or used any force to get defendant's DNA sample. Defendant said no.

Rossiter then began questioning defendant again, specifically about whether he had planned to give M marijuana. Miller added, "So don't lie to us now because your baby is on the line, right?," and defendant responded, "Yeah"

and admitted that he had planned to smoke marijuana with M. Rossiter then switched the conversation to discuss K. After denying remembering anything about her several times, Fitzgerald commented, "Dude we're going to start over. Tell the truth, because I'm getting a little irritated, because I have to safety plan for your kid. So get it together." After that comment, defendant began answering questions about K, but he denied sexual contact with her. Rossiter then began asking questions about M again. During that questioning, defendant stated that he was trying to be honest, because "my son's on the line." The questioning ended at 9:55 a.m.

Rossiter placed defendant under arrest and escorted him to the parking lot, where defendant spoke to his mother. After doing so, defendant started crying and told Rossiter there was more he had not told Rossiter and that he wanted to talk without being recorded. Rossiter responded that it had to be recorded. Defendant agreed, but only if Fitzgerald was not in the room. Rossiter and defendant then sat down alone for a second recorded interview.

At the start of the second interview, Rossiter provided defendant with new *Miranda* warnings, which defendant said he understood. In that interview, defendant said that M "came onto me. She wanted to do things, so we did it. And then the first time we kissed and stuff, made out. And then the second time is when those things happened." Defendant denied that he forced M to have sex and denied having sex with her before her eighteenth birthday. At the end of the interview, Rossiter and defendant also had the following exchange:

"[Rossiter]:   I understand. You know, [Fitzgerald] said something in there, which I didn't appreciate, which is she works with the absolute scum of the earth.

"[Defendant]:   And then she tells me that she's—(*crying*)

"*****

"[Defendant]:   —(*inaudible*) from me and I don't think that's respectful.

"[Rossiter]:   I never look at the people I deal with like they're the scum of the earth, okay? They're people that

messed up, people that can redeem themselves in some way, shape, or form in the future. But that all becomes— that all begins with honesty, okay?

"[Defendant]: I just didn't like how she said she was going to rip my fatherhood away from me."

Defendant also testified at the suppression hearing. He stated that Fitzgerald told him that, "if I didn't cooperate or answer questions that she would personally make sure that I would have no rights to my son and that I would never see him again." He testified that it affected him "mentally and emotionally" and made him "very, very distraught." He further testified that he felt like he had to talk to the detectives and that, but for the threats, he would not have.

In arguments to the court, the state conceded that the motion to suppress should be granted at the point that defendant voiced the pressure he was feeling from Fitzgerald at the end of the second interview, but asserted that the prior statements and the DNA evidence should be admitted at trial.

The trial court issued a letter opinion. The court concluded that defendant's statements up until Rossiter started to leave the room to get the DNA swabs were voluntary and admissible. The court flagged the statement by Rossiter mentioning defendant's infant son as the moment the issues with the interview began. After outlining the testimony about Fitzgerald's threats, the court found that "[d]efendant was not credible when he said he would not have talked if DHS had not threatened him. However, it was clear that he was upset by what Ms. Fitzgerald said to him." The court also found that defendant "was credible about being concerned, frightened about losing his son after his conversation with Ms. Fitzgerald." Finally, the court also found that, after Rossiter returned to the room and reminded defendant about his *Miranda* rights and that he had agreed to the DNA collection that "[d]efendant allowed Detective Rossiter to take the DNA sample exactly as he had agreed prior to the conversation with the DHS worker."

Based on ORS 136.425(1), the court suppressed all of the statements that defendant made after Rossiter left the

room to obtain the DNA swabs. However, the court allowed "the information about the consent to the DNA swabs and the taking of the samples *** and what occurred *prior* to Ms. Fitzgerald explaining things to him in the interview room."

On appeal, defendant assigns error to the trial court denying his motion to suppress with respect to the DNA evidence. Defendant argues that the trial court should have suppressed the DNA evidence, because defendant's consent to the search was not voluntary, under both Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. In the alternative, defendant argues that the DNA evidence should be suppressed because it derived from the violation of defendant's rights under Article I, section 12, of the Oregon Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. We review the trial court's denial of defendant's motion to suppress for legal error. *State v. Parnell*, 278 Or App 260, 261, 373 P3d 1252 (2016).

We begin by addressing defendant's state constitutional argument on the voluntariness of his consent to the buccal swab. Article I, section 9, provides that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." Taking a buccal swab from a person to collect their DNA is a search under that provision. *State v. H. K. D. S.*, 305 Or App 86, 91, 469 P3d 770 (2020). Warrantless searches are *per se* unreasonable under Article I, section 9, but one exception to the warrant requirement is when a person voluntarily consents to the search. *State v. Bonilla*, 358 Or 475, 480, 366 P3d 331 (2015).

Consent is an exception to the warrant requirement under Article I, section 9, "because consent relinquishes a person's privacy interest in [their person or] property so that there is no unlawful intrusion under Article I, section 9." *Id*. "When the state relies on consent, it must prove by a preponderance of the evidence that 'someone having the authority to do so' voluntarily gave the police consent to search the defendant's [person or] property and that any limitations on the scope of the consent were complied with."

*Id.* at 481 (quoting *State v. Weaver*, 319 Or 212, 219, 874 P2d 1322 (1994)). "The proper test for voluntariness of consent 'is to examine the totality of the facts and circumstances to see whether the consent was given by defendant's free will or was the result of coercion, express or implied.'" *State v. Unger*, 356 Or 59, 72, 333 P3d 1009 (2014) (quoting *State v. Kennedy*, 290 Or 493, 502, 624 P2d 99 (1981)). The totality of the circumstances includes "facts that may not have been available to the police when the decision to search was made." *Bonilla*, 358 Or at 492. "Absent an express revocation of initial consent, the permitted inference is that the initial consent continues." *State v. Zamora*, 237 Or App 514, 519, 240 P3d 91 (2010), *rev den*, 350 Or 297 (2011) (citing *State v. Ford*, 220 Or App 247, 251, 185 P3d 550 (2008)).

Defendant argues that, although his consent was voluntary at the time Rossiter asked him for a swab and left the room, the circumstances changed to coercion based on Fitzgerald's conduct, such that his consent was no longer voluntary, which requires suppression of the obtained DNA evidence. In making that argument, defendant emphasizes that totality of the circumstances evaluation and asserts that we must evaluate the voluntariness of his consent at the moment the search was executed. Defendant asserts that we should not apply the permissible inference that his initial voluntary consent continued, because it ignores the intervening coercive conduct of Fitzgerald, which is part of the totality of the circumstances.

We reject defendant's framing of the analysis because it has no basis in established law or the facts of this case as found by the trial court. Defendant concedes that he voluntarily consented to the buccal swab, and the trial court found that defendant submitted to the swab that he had consented to. *See State v. Blair*, 361 Or 527, 537, 396 P3d 908 (2017) ("In determining whether a particular search falls within the scope of a defendant's consent, the trial court will determine, based on the totality of circumstances, what the defendant actually intended. That determination is a factual one."). Defendant provides us with no legal basis to conclude that his voluntary consent to that swab ceased to exist once Fitzgerald pressured him to be "honest," such that new

consent was needed. Defendant's consent to the buccal swab, conversation with Fitzgerald, and Rossiter's return with the swab was part of a continuous transaction with respect to the buccal swab search—Rossiter was gone for less than 10 minutes, he only stepped away for the express purpose of obtaining the buccal swab kit, and defendant made no indication verbally or by conduct that his voluntary consent did not continue once Rossiter returned. *See State v. Luther*, 63 Or App 86, 89, 663 P2d 1261, *aff'd on other grounds*, 296 Or 1, 672 P2d 691 (1983), *overruled on other grounds by State v. Affeld*, 307 Or 125, 764 P2d 220 (1988) ("The question here is limited to the effect of the few minutes' delay between the initial search and the seizure, during which defendant closed the door to his room. There is no question but that the police officers could properly have seized the gun during the initial search while they were present with defendant's consent and in response to the emergency call. Absent express revocation of an initial consent, *i.e.*, absent objection to a subsequent, closely related entry and search after the initial consensual entry and search, the permitted inference is that the initial consent continued."); *State v. Evans*, 10 Or App 602, 606, 500 P2d 470, *rev den* (1973) ("Whether or not the defendant's mother affirmatively consented to Officer Rissman's re-entry of the house is immaterial. The record contains no evidence whatever that she attempted to revoke the permission she had previously given the police to enter and arrest defendant. In the absence of any express revocation of the consent which the mother had previously given, that consent continued through the seizure of evidence incident to defendant's arrest, when, as here, that seizure was a part of the continuous sequence of the arresting process."). Here, the circumstances support applying the permissive inference that defendant's voluntary consent continued. Under our established case law, defendant voluntarily consented to the swab.

Additionally, even if relevant to the voluntariness of defendant's consent in this case, there is no evidence that Fitzgerald's pressure on defendant was in any way related to his consent to the buccal swab or had any effect on defendant's decision to submit to the buccal swab that he had already voluntarily consented to. Indeed, the trial court

discredited defendant's testimony that Fitzgerald's pressure affected his decision to keep talking with the detectives, a matter that Fitzgerald's pressure *was* directly related to. As a result, we conclude that, under the totality of the circumstances, defendant's consent to the buccal swab was voluntary.[1]

We reach the same conclusion under the Fourth Amendment. Under the Fourth Amendment, voluntary consent is an exception to the warrant requirement for a search. *Schneckloth v. Bustamonte*, 412 US 218, 219, 93 S Ct 2041, 36 L Ed 2d 854 (1973). Both parties agree that the correct standard for voluntary consent is the one articulated in *Schneckloth*, and they further agree that we use the same test for voluntariness under the Fourth Amendment as we do under Article I, section 9. *Ry/Guinto*, 211 Or App at 309 (explaining that, under the Fourth Amendment, voluntariness is a question of fact and the test described in *Schneckloth* "is essentially the same as the test under the Oregon Constitution, and requires the state to prove that 'the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied'" (quoting *Schneckloth*, 412 US at 248-49)); *see also U.S. v. Russell*, 664 F3d 1279, 1282 (9th Cir 2012) (concluding pat-down search that included groin area was voluntary where the defendant "did nothing to manifest any change of heart about his consent to search"); *U.S. v. Sanders*, 424 F3d 768, 774 (8th Cir 2005) ("If equivocal, a defendant's attempt to withdraw consent is ineffective and police may reasonably continue their search pursuant to the initial grant of authority."). As a result, for the same reasons we have already articulated above, we conclude that, under the Fourth Amendment, defendant's consent to the buccal swab was voluntary.

Defendant also argues that the trial court should have suppressed the DNA evidence, even if his consent was

---

[1] We do not foreclose entirely that a voluntary consent given just prior to an inducement could be affected by that inducement. We leave open the argument that suppression could be required in the right case where the alleged unlawful coercion occurs after obtaining consent but before completion of the search, because, conceivably, such unlawful conduct could be used to prevent a defendant from revoking or limiting a previously obtained voluntary consent. However, that is not the argument that defendant asserts.

voluntary, because that consent was derived from a viola-tion of his rights under Article I, section 12, of the Oregon Constitution, and the Fifth and Fourteenth Amendments to the United States Constitution. Defendant argues that, although the trial court suppressed his statements under ORS 136.425(1),[2] the argument applies because the consti-tutional analyses and the statutory analysis are the same. Defendant argues that, under the standard articulated in *State v. Jarnagin*, 351 Or 703, 277 P3d 535 (2012), the officers used his involuntary statements to induce him to provide the DNA sample and, thus, the sample must be suppressed.

We agree with defendant that we have recognized that ORS 136.425(1) and Article I, section 12, "contain coextensive voluntariness requirements" and we have not employed separate analyses with respect to those author-ities. *State v. Benson*, 313 Or App 748, 756-57, 495 P3d 717 (2021) (defendant's arguments in the trial court under Article I, section 12, and the Fifth Amendment preserved for appeal his arguments under ORS 136.425(1)). In addi-tion, the state does not argue on appeal that defendant's statements following Fitzgerald's conduct were voluntary under Article I, section 12. Thus, we proceed to address defendant's argument that his consent to the buccal swab was derived from that constitutional violation.

The remedy for an Article I, section 12, violation extends not only to a defendant's statements made in response to the violation "but also to the physical and testimonial evi-dence that is a product of that violation." *Jarnagin*, 351 Or at 716. Under *Jarnagin*, we look to the totality of the circum-stances to determine whether physical evidence is derived from or a product of an earlier violation. *Id*. In making that inquiry, we consider, among other things, the nature of the violation, the amount of time between the violation and the consent to search, whether the suspect remained in custody during that time, subsequent events that may have dissi-pated the taint of the earlier violation, and the use that the state has made of the statements obtained in violation of

_____

[2] ORS 136.425(1) provides, "A confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats."

Article I, section 12. *Id.* at 716. The inquiry is fact intensive and requires us to determine whether, considering all the circumstances, defendant's decision to consent to and submit to the buccal swab is sufficiently a product of the Article I, section 12, violation that suppression is necessary to vindicate his Article I, section 12, rights. *Id.*

Here, we conclude that defendant's consent and submission to the buccal swab was not derived from or the product of the violation of his Article I, section 12, rights. The nature of the violation was not flagrant. Fitzgerald did put coercive pressure on defendant to be "honest" in relation to her being able to develop a safety plan so defendant could continue to parent. However, although we have stated such statements can be an inducement requiring suppression under ORS 136.425(1), *State v. Hogeland*, 285 Or App 108, 119-20, 395 P3d 960 (2017), Fitzgerald's conduct was not flagrant, as the Supreme Court has explained that term with respect the derivation analysis under *Jarnagin*. *See Jarnagin*, 351 Or at 717 (a violation was not flagrant where officers failed to recognize that the circumstances were compelling and required *Miranda* warnings, as compared to a flagrant violation where "officers advised defendant of his *Miranda* rights and then proceeded to question him despite his repeated requests for counsel"). At the time of the violation, defendant had already received proper *Miranda* warnings, had voluntarily waived those rights and made several voluntary statements, including that he had no reason to believe his DNA would be found on M, and had voluntarily consented to the buccal swab. At no point did defendant seek to assert a right to counsel or to remain silent. In that light, the nature of the violation in relation to defendant's submission to the swab is tempered, particularly as Fitzgerald's conduct was focused on defendant making honest statements and not on overriding any assertion of his rights.

Although the violation and defendant's subsequent submission to the buccal swab was close in time, any taint from the violation is significantly dissipated by defendant's *prior* voluntary consent to the swab and his failure to manifest at any time any change of heart about giving that consent. *See Parnell*, 278 Or App at 268-69 (holding that, where the defendant's consent to police to enter his home

preceded the unlawful police trespass, defendant's argument that his consent was tainted by police illegality failed). In addition, upon Rossiter's return, he reminded defendant of his *Miranda* rights and that he had consented to the swab before he left. Rossiter found out that Miller had told defendant that the medical report was taken when M was 17, and discussed that with defendant, who continued to adamantly maintain that he had no reason to believe that his DNA would have been found on M. Defendant then complied with opening his mouth and having both of his cheeks swabbed by Rossiter. The trial court found that defendant submitted to the search to which he had already consented, and the evidence supports that finding. Given the sequence of events presented here, and considering all of the circumstances, we conclude that defendant's consent to the buccal swab was not sufficiently derived from or a product of any Article I, section 12, violation such as to necessitate suppression of that evidence.[3]

Affirmed.

---

[3] Defendant does not separately develop any arguments under federal law to support his contention that the DNA evidence must be suppressed under the Fifth and Fourteenth Amendments. Accordingly, we reject that contention. *See, e.g.*, *State v. McNeely*, 330 Or 457, 468, 8 P3d 212, *cert den*, 531 US 1055 (2000) (declining to address undeveloped argument under the federal constitution).